Barry I. Levy, Esq.
Frank P. Tiscione, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,*
*Liberty Mutual Fire Insurance Company, Liberty Insurance*
*Corporation, The First Liberty Insurance Corporation, LM*
*Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance*
*Company, Liberty County Mutual Insurance Company, LM*
*Property and Casualty Insurance Company, Safeco Company*
*of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LIBERTY MUTUAL INSURANCE COMPANY,
LIBERTY MUTUAL FIRE INSURANCE COMPANY,
LIBERTY INSURANCE CORPORATION,                                        Docket No.:_____ (        )
THE FIRST LIBERTY INSURANCE CORPORATION,
LM INSURANCE CORPORATION,
LIBERTY MUTUAL MID-ATLANTIC INSURANCE
COMPANY, LIBERTY COUNTY MUTUAL INSURANCE                             **Plaintiff Demands a Trial by**
COMPANY, LM PROPERTY and CASUALTY                                    **Jury**
INSURANCE COMPANY, SAFECO COMPANY OF
INDIANA, and AMERICAN STATES INSURANCE
COMPANY,

                              Plaintiffs,

                      -against-

GM WELLNESS MEDICAL, P.C.,
GM MEDICAL SERVICES, P.C.,
GABOR MENCZELESZ, M.D.,
CECILLE I. FRAY, M.D. PLLC,
CECILLE I. FRAY, M.D.,
GALMAR DIAGNOSTIC MEDICAL, P.C.,
MAG MEDICAL DIAGNOSTICS, P.C.,
MG MEDICAL CARE, P.C.,
MARINA GALEA, M.D.,
CLASSIC MEDICAL DIAGNOSTIC REHAB, P.C.,
YEKATERINA SLUKHINSKY, M.D.,
AHARON GUTTERMAN, M.D., PLLC,

BALDO WELLNESS MEDICAL, P.C.,
ALEXANDER BALDONADO, M.D.,
RALPH MEDICAL DIAGNOSTICS, P.C.,
RAFAEL SEZAN, M.D.,
VALERIY SABODASH, M.D.,
VLADISLAV ZARETSKIY, and
JOHN DOE DEFENDANTS "1" – "10",

                            Defendants.

-------------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against Defendants, GM Wellness Medical, P.C., GM Medical Services, P.C., Gabor Menczelesz, M.D., Cecille I. Fray, M.D. PLLC, Cecille I. Fray, M.D., Galmar Diagnostic Medical, P.C., MAG Medical Diagnostics, P.C., MG Medical Care, P.C., Marina Galea, M.D., Classic Medical Diagnostic Rehab, P.C., Yekaterina Slukhinsky, M.D., Aharon Gutterman, M.D., PLLC, Baldo Wellness Medical, P.C., Alexander Baldonado, M.D., Ralph Medical Diagnostics, P.C., Rafael Sezan, M.D., Valeriy Sabodash, M.D., Vladislav Zaretskiy and John Doe Defendants "1" through "10" (collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $549,000.00 that the Defendants wrongfully obtained from Liberty Mutual by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including purported patient examinations, nerve conduction

velocity ("NCV") testing, and electromyography ("EMG") studies (collectively the "Fraudulent Services"), which allegedly were provided to New York automobile accident victims insured by Liberty Mutual ("Insureds") and other insurers.

2.      Defendants, Alexander Baldonado, M.D., Cecille I. Fray, M.D., Yekaterina Slukhinsky, M.D., Gabor Menczelesz, M.D., Marina Galea, M.D., Rafael Sezan, M.D., and Valeriy Sabodash, M.D. (collectively, the "Nominal Owners") as well as non-party Aharon Gutterman, M.D., are physicians licensed to practice in New York who purport to own a series of medical professional corporations and sole proprietorships, including Defendants Aharon Gutterman, M.D., PLLC, Baldo Wellness Medical, P.C., Cecille I. Fray, M.D. PLLC, Classic Medical Diagnostic Rehab, P.C., GM Wellness Medical, P.C., Galmar Diagnostic Medical, P.C., GM Medical Services, P.C., MAG Medical Diagnostics, P.C., MG Medical Care, P.C., Ralph Medical Diagnostics, P.C., and Valeriy Sabodash, M.D.  (collectively, the "Provider Defendants"), engaged in a large scale fraud scheme to billing Liberty Mutual and other New York automobile insurers for the excessive and medically useless Fraudulent Services.  The Provider Defendants purport to be legitimate medical providers, but they operate on a transient basis, maintaining no stand-alone practices, having no patients of their own, and providing no legitimate or medically necessary services.

3.      Notwithstanding Defendants' submission of billing under 11 different names -- ostensibly separate professional "practices" – each Provider Defendant operated in virtually identical fashion, with each purporting to render Fraudulent Services pursuant to the same fraudulent, pre-determined treatment and billing protocol overseen by Vladislav Zaretskiy ("Zaretskiy") and John Doe Defendants "1" – "10".  The Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10", furthered the fraudulent scheme using illegal referral and kickback

arrangements to permit the Provider Defendants to access a steady stream of patients, fraudulently bill Liberty Mutual, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

4.     Liberty Mutual seeks to recover the monies stolen from it and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $500,000.00 in pending no-fault insurance claims for the Fraudulent Services that have been submitted by or on behalf of the Provider Defendants because:

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(ii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual;

(iii)   the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements; and

(iv)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the Provider Defendants, and therefore were unreimbursable.

5.     The Defendants fall into the following categories:

(i)     Defendants Aharon Gutterman, M.D., PLLC ("Gutterman PC"), Baldo Wellness Medical, P.C. ("Baldo Wellness"), Cecille I. Fray, M.D. PLLC ("Fray PC"), Classic Medical Diagnostic Rehab, P.C. ("Classic Medical"), GM Wellness Medical, P.C. ("GM Wellness"), Galmar Diagnostic Medical, P.C. ("Galmar Diagnostic"), GM Medical Services, P.C. ("GM Medical"), MAG Medical Diagnostics, P.C. ("MAG Medical"), MG Medical Care, P.C. ("MG Medical"), Ralph Medical Diagnostics, P.C. ("Ralph Medical"), Valeriy Sabodash, M.D., ("Unincorporated Sabodash Provider") (collectively, the "Provider Defendants") are New York medical providers and sole proprietorships through which the Fraudulent Services purportedly were performed and were billed to automobile insurance companies, including Liberty Mutual.

(ii)     Defendants Alexander Baldonado, M.D. ("Baldonado"), Cecille I. Fray, M.D. ("Fray"), Yekaterina Slukhinsky, M.D. ("Slukhinsky"), Gabor Menczelesz, M.D. ("Menczelesz"), Marina Galea, M.D. ("Galea"), Valeriy Sabodash, M.D. ("Sabodash") and Rafael Sezan, M.D. ("Sezan"), (collectively, the "Nominal Owners") are physicians licensed to practice medicine in New York, who purport to own the Provider Defendants, and who purported to perform some of the Fraudulent Services.

(iii)    Vladislav Zaretskiy ("Zaretskiy") is a layperson who furthered the fraudulent scheme perpetrated against Liberty Mutual by, among other things, referring Insureds to the Provider Defendants in exchange for kickbacks from the Nominal Owners and the Provider Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

(iv)     John Doe Defendants "1"-"10" are individuals who, along with Zaretskiy, furthered the fraudulent scheme perpetrated against Liberty Mutual by, among other things, referring Insureds to the Provider Defendants in exchange for kickbacks from the Nominal Owners and the Provider Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

6.      As discussed herein, the Defendants at all relevant times have known that (i) the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; (iii) the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons and through the use of illegal kickback arrangements; and (iv) in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the Provider Defendants.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to Liberty Mutual through the Provider Defendants.

8.      The charts annexed hereto as Exhibits "1" – "11" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to Liberty Mutual.

9.      The Defendants' fraudulent scheme began as early as 2016 and continues uninterrupted through the present day. As a result of the Defendants' fraudulent scheme, Liberty Mutual has incurred damages of more than $549,000.00.

## THE PARTIES

### I.      Plaintiffs

10.     Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11.     Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts.  Liberty Insurance Corporation, The First Liberty Insurance Corporation and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12.     Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Fire Insurance Company

is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.     Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts.  Liberty County Mutual Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

14.     Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are Indiana corporations with its principal place of business in Boston, Massachusetts.  LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

## II.     Defendants

15.     Defendant Baldonado resides in and is a citizen of New York.  Baldonado was licensed to practice medicine in New York on July 11, 2013 and serves as the nominal owner of Baldo Wellness.

16.     Baldonado has a sordid history of involvement in insurance fraud schemes.  For example, in United States of America v. Baldonado, 21-cr-00430 (D.N.J. 2021), Baldonado was charged with six counts of health care fraud for allegedly participating in an event that advertised COVID-19 testing and for allegedly ordering expensive and medically unnecessary cancer genetic testing for Medicare beneficiaries who attended the event. Baldonado also allegedly billed Medicare for services, including lengthy office visits, that he never provided to these beneficiaries. Approximately $2 million in claims were submitted as a result of Baldonado's COVID-19 health

care fraud scheme, and approximately $17 million in claims were submitted as a result of Baldonado's broader health care fraud scheme.

17.   Defendant Baldo Wellness is a New York professional corporation incorporated on or about August 19, 2016 and purports to be owned and controlled by Baldonado.  Baldo Wellness has been used by Baldonado, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

18.   Defendant Slukhinsky resides in and is a citizen of New York.  Slukhinsky was licensed to practice medicine in New York on August 21, 1986 and serves as the nominal owner of Classic Medical.

19.   Slukhinsky also has a history in insurance fraud schemes where it was alleged, she engaged in illegal kickbacks and referral arrangements and used her professional corporation as a vehicle to submit fraudulent no-fault insurance billing to automobile insurers.

20.   Defendant Classic Medical is a New York professional corporation incorporated on or about June 19, 2017 and purports to be owned and controlled by Slukhinsky.  Classic Medical has been used by Slukhinsky, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

21.   Defendant Galea resides in and is a citizen of New Jersey.  Galea was licensed to practice medicine in New York on July 3, 1997 and serves as the nominal owner of Galmar Diagnostic, MAG Medical, and MG Medical.

22.   Galea has a history of insurance fraud schemes in which it was alleged, she used her professional corporations as vehicles to submit fraudulent no-fault insurance billing to automobile insurers.

23.     Defendant Galmar Diagnostic is a New York professional corporation incorporated on or about August 29, 2017 and purports to be owned and controlled by Galea.  Galmar Diagnostic has been used by Galea, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

24.     Defendant MAG Medical is a New York professional corporation incorporated on or about February 18, 2016 and purports to be owned and controlled by Galea.  MAG Medical has been used by Galea, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

25.     Defendant MG Medical is a New York professional corporation incorporated on or about October 7, 2016, and purports to be owned and controlled by Galea.  MG Medical has been used by Galea, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

26.     Defendant Sabodash resides in and is a citizen of Florida.  Sabodash was licensed to practice medicine in Florida on March 6, 2014, and was licensed to practice medicine in New York on April 4, 2018.

27.     Sabodash also has a history of involvement in no-fault insurance fraud schemes in which it was alleged, he used his unincorporated medical practice as a vehicle to submit fraudulent no-fault insurance billing to automobile insurers.

28.     The Unincorporated Sabodash Provider has been used by Sabodash, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

29.     Defendant Fray resides in and is a citizen of New York.  Fray was licensed to practice medicine in New York on September 2, 1986 and serves as the nominal owner of Fray PC.

30.     Fray has a history of insurance fraud schemes in which it was alleged, he used his professional corporations as vehicles to submit fraudulent no-fault insurance billing to automobile insurers.

31.     Defendant Fray PC is a New York professional corporation incorporated on or about May 21, 2004, with its principal place of business in New York, and purports to be owned and controlled by Fray.  Fray PC has been used by Fray, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

32.     Defendant Menczelesz resides in and is a citizen of New York.  Menczelesz was licensed to practice medicine in New York on May 26, 1998 and serves as the nominal owner of GM Wellness and GM Medical.

33.     Defendant GM Wellness is a New York professional corporation incorporated on or about August 22, 2017 and purports to be owned and controlled by Menczelesz.  GM Wellness has been used by Menczelesz, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

34.     Defendant GM Medical is a New York professional corporation incorporated on or about April 18, 2019 and purports to be owned and controlled by Menczelesz.  GM Medical has been used by Menczelesz, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

35.     Defendant Sezan resides in and is a citizen of New York.  Sezan was licensed to practice medicine in New York on July 5, 2005 and serves as the nominal owner of Ralph Medical.

36.     Defendant Ralph Medical is a New York professional corporation incorporated on or about March 30, 2010 and purports to be owned and controlled by Sezan.  Ralph Medical has been used by Sezan, Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

37.     Defendant Gutterman PC is a New York professional corporation incorporated on or about November 30, 2010 and purports to be owned and controlled by non-defendant Aharon Gutterman, M.D.  Gutterman PC has been used by non-defendant Aharon Gutterman, M.D., Zaretskiy and John Doe Defendants "1" – "10" as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

38.     Aharon Gutterman, M.D. passed away on or about March 18, 2021 before the filing of this complaint.

39.     Defendant Zaretskiy resides in and is a citizen of New York. Zaretskiy is an unlicensed, non-professional who knowingly participated in the fraudulent scheme by, among other things, referring Insureds to the Provider Defendants in exchange for kickbacks from the Nominal Owners and the Provider Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits, without regard to genuine patient care.

40.     Zaretskiy was indicted for his involvement and participation in no-fault insurance fraud schemes, including the illegal ownership and control of no-fault clinic locations where the Provider Defendants rendered certain services as well as engaging in illegal kickbacks. See USA v. Zemlyansky, et al., 12-cr-00171 (JPO). Zaretskiy thereafter pled guilty to attempt and conspiracy to commit health care fraud. Id.

41.     Zaretskiy was also sued on multiple occasions by insurance carriers for allegations that he illegally owned and controlled no-fault clinic locations, engaged in illegal kickbacks, and/or directed the fraudulent treatment protocol.

42.     Upon information and belief, John Doe Defendants "1" – "10" reside in and are citizens of New York.   John Doe Defendants "1" – "10" are unlicensed, non-professional individuals and entities, presently not identifiable, who, together with Zaretskiy, knowingly participated in the fraudulent scheme by, among other things, referring Insureds to the Provider Defendants in exchange for kickbacks from the Nominal Owners and the Provider Defendants and spearheading the pre-determined fraudulent protocols used to maximize profits, without regard to genuine patient care.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

44.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

45.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

46.      Liberty Mutual underwrites automobile insurance in New York.

**I.      An Overview of the Pertinent Law Governing No-Fault Reimbursement**

47.      New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.), automobile insurers are required to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

48.      In New York, PIP Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including medical services.

49.      In New York, an Insured can assign his/her right to PIP Benefits to health care goods and services providers in exchange for those services.

50.      In New York, pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, in New York, a healthcare services provider may submit claims using the Health Care Financing Administration claim form (known as the "HCFA-1500 form").

51.      Pursuant to the New York no-fault insurance laws, healthcare services providers are not eligible to bill for or to collect PIP Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

52.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

53.     Medical professional entities incorporated in New York must both be owned by a licensed professional authorized by law to practice in New York and who is actually engaged in the practice of medicine in such corporation. N.Y. Bus. Corp. Law §1507.

54.     In New York, only a licensed physician may practice medicine, may own and control a professional corporation authorized to practice medicine and, absent statutory exceptions not applicable in this case, may derive economic benefit from medical services.  Unlicensed individuals in New York may not practice medicine, may not own or control a professional corporation authorized to practice medicine, may not employ or supervise physicians, and, absent statutory exceptions not applicable in this case, may not derive economic benefit from medical services.

55.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See</u>, <u>e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

56.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See</u> <u>e.g.</u>, New York Education Law §6512, §6530 (11), and (19).

57.     Pursuant to 8 N.Y.C.R.R. § 29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

58.     Therefore, under the New York no-fault insurance laws, a healthcare services provider is not eligible to receive PIP Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered, or allows unlicensed laypersons to share in the fees for the professional services.

59.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

60.     Pursuant to the New York no-fault insurance laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect PIP Benefits.  There is both a statutory and regulatory prohibition against payment of PIP Benefits to anyone other than the patient or his/her healthcare services provider.  The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

61.     Accordingly, for a healthcare services provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to New York Insurance Law § 5102(a), it must be the <u>actual</u> provider of the services.  Under the New York no-fault insurance laws, a healthcare services provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare services provider, such as independent contractors.

62.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

63.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

64.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a healthcare services provider to Liberty Mutual, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.      The Defendants' Fraudulent Scheme

### A.      Overview of the Scheme

65.     Beginning in 2016, and continuing through the present day, the Nominal Owners, Provider Defendants, Zaretskiy and John Doe Defendants "1" – "10" (collectively, the

16

"Defendants"), masterminded and implemented a complex fraudulent scheme in which the Provider Defendants were used to bill Liberty Mutual and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise unreimbursable services.

66.     Throughout the duration of the fraudulent scheme, the Provider Defendants were "transient" providers that maintained no fixed treatment locations of any kind; never maintained stand-alone practices; had no internet website or otherwise advertised or marketed their services; were not the owners or leaseholders of the real property from which they purported to provide the Fraudulent Services; and indeed, provided no legitimate or medically necessary services.

67.     The Provider Defendants did not advertise for patients and did virtually nothing as would be expected of legitimate medical "practices" to develop their reputation and attract patients who legitimately require care and treatment.

68.     Similarly, the Nominal Owners did not market the Provider Defendant's existence to the general public, did not advertise for patients, and did nothing to build any form of name recognition to draw legitimate business.

69.     While the Nominal Owners purported to be the sole owners of the Provider Defendants, they did virtually nothing as would be expected of the owners of legitimate medical practices to develop their reputation or attract patients.

70.     Despite failing to publicly market their services, the Provider Defendants each had a steady flow of patients the moment they began rendering the Fraudulent Services due to improper financial and referral arrangements that Defendants entered into with Zaretskiy, John Doe Defendants "1" – "10", other healthcare providers and/or clinic controllers at each no-fault clinic location.

71.     Further, the Nominal Owners were not responsible for, or in control of, coordinating and scheduling the technicians or "employees" who worked at the numerous clinic locations under the names of the Provider Defendants.  In fact, Zaretskiy and John Doe Defendants "1" – "10" hired these individuals and supervised and directed them to each of the no-fault clinic locations each day.  Many of these individuals were hired by Zaretskiy and John Doe Defendants "1" – "10" without the Nominal Owners knowledge.

72.     Notwithstanding Defendants' submission of billing under 11 different names -- ostensibly separate professional "practices" with purportedly different owners -- the eleven "practices" that operated under the names of the Provider Defendants all operated in virtually identical fashion, with each purporting to render Fraudulent Services pursuant to the same fraudulent, pre-determined treatment and billing protocol overseen by Zaretskiy.

73.     This was accomplished by the fact that Zaretskiy and John Doe Defendants "1" – "10" were in charge of the billing and collections for the Provider Defendants and handled the creation, retention and submission of the billing from the Provider Defendants. In fact, the Nominal Owners, rarely, if at all, reviewed the billing prior to their submission to Liberty Mutual.

74.     Because the healthcare practices of the Provider Defendants engaged in improper financial and referral arrangements with themselves and others, including Zaretskiy, Defendants shared a pool of no-fault clinics from which they received patient referrals. As a result, many of the no-fault clinic locations at which Defendants allegedly rendered the Fraudulent Services were shared with at least one, if not more, of the other healthcare providers in the scheme.

75.     As a result of the improper financial and referral arrangements, Zaretskiy and John Doe Defendants "1" – "10" required the Nominal Owners operate the Provider Defendants on a transient basis from at least sixty (60) "No-Fault" medical clinics, primarily located in Brooklyn,

Queens, and Bronx, where the Provider Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics") – some of which were shared by at least two, but in most cases more, of the Provider Defendants:

- 5506 Avenue N, Brooklyn;
- 1611 East New York Avenue, Brooklyn;
- 3910 Church Avenue, Brooklyn;
- 3209 Fulton Street, Brooklyn;
- 108 Kenilworth Place, Brooklyn;
- 9801 Foster Avenue, Brooklyn;
- 160-59 Rockaway Boulevard, Jamaica;
- 717 Southern Boulevard, Bronx;
- 1120 Morris Park Avenue, Bronx;
- 205-16 Jamaica Avenue, Hollis;
- 550 Remsen Avenue, Brooklyn;
- 1736 Shore Parkway, Brooklyn;
- 2625 Atlantic Avenue, Brooklyn;
- 205-20 Jamaica Avenue, Hollis;
- 107-48 Guy R Brewer Boulevard, Jamaica;
- 146 Empire Boulevard, Brooklyn;
- 79-09 Northern Boulevard, Jackson Heights;
- 1552 Ralph Avenue, Brooklyn;
- 764 Elmont Road, Elmont;
- 1500 Astor Avenue, Bronx;
- 1 Fulton Avenue, Hempstead;
- 150 Graham Avenue, Brooklyn
- 552 E 180st Street, Bronx;
- 1975 Linden Boulevard, Elmont;
- 1894 Eastchester Road, Bronx.

**B.      The Illegal Kickback and Referral Relationships**

76.      Zaretskiy, along with John Doe Defendants "1" – "10", oversaw the operations at the Clinics, including the provision of healthcare services at the Clinics.

77.      At each of these Clinics, pursuant to the improper financial and referral arrangements orchestrated by Zaretskiy and the John Doe Defendants "1" – "10", Defendants allegedly rendered, or caused to be rendered, EMG/NCV tests to Insureds.

78.     In exchange for being allowed to perform the Fraudulent Services, Defendants paid the clinic controllers and/or referring medical providers at the Clinics and agreed that the results of the Fraudulent Services would be pre-ordained, so they could be used to justify further treatment and corresponding bills to Liberty Mutual (and likely other insurers), by the other healthcare providers at the Clinics.  The Nominal Owners knew and understood that they could gain access to these Clinics and their steady stream of patients only if they agreed to pay kickbacks or other forms of financial consideration to Zaretskiy,  John Doe Defendants "1" – "10", owners and controllers of the Clinics, and other laypersons supplying patients to the Clinics.

79.     The relationships that allowed Defendants to operate their transient healthcare practices were not designed for a legitimate purpose. Intertwining their illegitimate goals, Defendants, including Zaretskiy and John Doe Defendants "1" – "10", and the healthcare providers and/or clinic controllers at these various Clinics agreed that Defendants would be given access to the Clinics' Insureds in exchange for: (i) payments, such as those in the form of ostensibly legitimate fees for "rent," equipment, personnel, transportation, or other types of services; and/or (ii) providing the Fraudulent Services, which virtually always supported continued performance of healthcare services by the healthcare providers and/or clinic controllers.  This quid-pro-quo allowed Defendants to financially benefit through access to patients needed in order to submit their fraudulent billing and enabled Zaretskiy, John Doe Defendants "1" – "10", other healthcare providers and/or clinic controllers to financially benefit by way of direct payments and/or from Defendants' treatment protocol purportedly justifying further billing for the healthcare providers' and/or clinic controllers' medically unnecessary services.

80.     To further accomplish this scheme, Zaretskiy and the John Doe Defendants "1" – "10" negotiated entry into the various Clinics for the Provider Defendants, including lease

arrangements and payments.  In fact, the Nominal Owners were unfamiliar with the specific lease details and payments Zaretskiy arranged or certain locations where Zaretskiy actually submitted billing without their knowledge.

81.     The Provider Defendants' "success" in generating profits was the product of these improper financial and referral arrangements, rather than through any legitimate means, and enabled them to provide the Fraudulent Services at as many different treating locations as possible to maximize billing while, at the same time, making it harder for Liberty Mutual to detect the totality of Defendants' fraudulent scheme.

82.     Several of these Clinic locations were "revolving doors" of healthcare providers, including the Provider Defendants, billing for services purportedly provided to Insureds at the location, all geared towards exploiting New York's no-fault insurance system.

83.     In fact, Liberty Mutual received billing from many of these Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

84.     The Clinics were nothing more than hubs for a "revolving door" of medical providers, with each clinic typically housing upwards of 50 different healthcare providers rendering services from the location.

85.     For example, at the Clinic located at 717 Southern Boulevard, Bronx, Liberty Mutual has received billing for healthcare services from a "revolving door" of approximately fifty (50) separate healthcare providers.

86.     In addition, Liberty Mutual has received billing for purported healthcare services rendered at a Clinic located at 1552 Ralph Avenue, Brooklyn from a "revolving door" of approximately thirty (30) or more separate healthcare providers.

87.     Further, Liberty Mutual has received billing for purported healthcare services rendered at a Clinic located at 1611 East New York Avenue, Brooklyn from a "revolving door" of approximately thirty (30) or more separate healthcare providers.

88.     The Nominal Owners enabled the Provider Defendants to gain access to the Clinics by paying kickbacks to Zaretskiy, the John Doe Defendants "1" – "10" and individuals and entities that controlled the Clinics.

89.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics.

90.     For example, a physician who operated from the Clinics averred that Zaretskiy coordinated and oversaw the Clinics, made and/or received payments for directing healthcare practices to operate at the Clinic, controlled billing and collection activity, and was involved in submitting fabricated billing and treatment reports to insurers. These Clinics included: (i) 1 Fulton Avenue, Hempstead; (ii) 1894 Eastchester Road, Bronx; (iii) 717 Southern Boulevard, Bronx; (iv) 79-09 Northern Boulevard, Jackson Heights; (v) 1120 Morris Park Avenue, Bronx; (vi) 1611 East New York Avenue, Brooklyn; (vii) 1975 Linden Boulevard, Elmont; and (viii) 108 Kenilworth Place, Brooklyn.

91.     Further, Liberty Mutual has been advised by a physician allegedly billing for extracorporeal shockwave therapy submitted under her name to Liberty Mutual was not authorized by her and that the signatures on the treatment and claim records were forgeries and/or

unauthorized duplicates. The billing originated from Clinics located at: (i) 3910 Church Avenue, Brooklyn and (ii) 150 Graham Avenue, Brooklyn.

92.     Furthermore, Clinics from which the Provider Defendants operated are part of the clinics at issue in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG) (S.D.N.Y.) ("USA v. Rose"), wherein numerous individuals were indicted for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information that was used to steer them to a network of medical clinics (and lawyers) where the clinic controllers paid kickbacks in exchange for the referrals.  These include Clinics located at: (i) 205-20 Jamaica Avenue, Hollis; (ii) 2625 Atlantic Avenue, Brooklyn; (iii) 717 Southern Boulevard, Bronx; (iv) 764 Elmont Road, Elmont; and (v) 79-09 Northern Boulevard, Jackson Heights.

93.     Furthermore, in Liberty Mutual Insurance Co., et al. v. Moon Rehab, PT, P.C., et al., 1:17-cv-03803 (E.D.N.Y. 2017), Liberty Mutual alleged that unlicensed laypersons illegally owned and controlled the Clinic located at 205-20 Jamaica Avenue, Hollis as well as directed a fraudulent treatment and billing protocol in order to obtain illegal profits.

94.     In Liberty Mutual Insurance Co., et al. v. MC Physical Therapy, P.C., et al., 2:21-cv-06805 (E.D.N.Y. 2021), Liberty Mutual alleged in detail that unlicensed laypersons illegally owned, controlled and/or engaged in improper financial and referral arrangements with professional corporations that purportedly provided medically unnecessary services to Insureds at such Clinics located at: (i) 107-48 Guy R. Brewer Boulevard, Jamaica; (ii) 550 Remsen Avenue, Brooklyn; (iii) 3910 Church Avenue, Brooklyn; (iv) 1975 Linden Boulevard, Elmont; (v) 1120 Morris Park Avenue, Bronx;  and (vi) 3209 Fulton Street, Brooklyn.

95.     Moreover, in Liberty Mutual Insurance Company, et al. v. BSS Medical, P.C., et al., 600021/2019 (Sup. Ct. Nassau County), Liberty Mutual alleged in detail that unlicensed

laypersons illegally owned, controlled and/or engaged in improper financial and referral arrangements with several professional corporations that purportedly provided medically unnecessary services to Insureds at such Clinics located at: (i) 107-48 Guy R. Brewer Boulevard, Jamaica; (ii) 550 Remsen Avenue, Brooklyn; (iii) 1736 Shore Parkway, Brooklyn; (iv) 2363 Ralph Avenue, Brooklyn;  (v) 2625 Atlantic Avenue, Brooklyn; (vi) 3910 Church Avenue, Brooklyn; and (vii) 764 Elmont Road, Elmont.

96.     In addition, in Government Employees Insurance Company, et al. v. Marina Galea, M.D., et al., 1:19-cv-00663 (E.D.N.Y. 2019), the plaintiff-insurers alleged in detail that unlicensed laypersons illegally owned and controlled several professional corporations that purportedly provided medically unnecessary services to Insureds at such Clinics located at: (i) 5506 Avenue N, Brooklyn; (ii) 1500 Astor Avenue, Bronx; (iii) 615 Seneca Avenue, Ridgewood; and (iv) 625 East Fordham Road, Bronx.

97.     In addition, the professionals and/or their purported medical professional corporations who referred Insureds to the Provider Defendants for the Fraudulent Services have a significant history of insurance fraud.  For example, the following are relevant facts related to several of the primary referral sources:

- Jean-Pierre Barakat, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; and (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds. See Government Employees Insurance

<u>Company et al. v. Barakat, M.D. et al.</u>, 1:17-cv-01066 (NGG) (LB) (E.D.N.Y. 2017).

- Joseph Raia, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds; and (iv) referring patients for medically unnecessary testing that was subject to the direction of unlicensed individuals. <u>See</u> <u>Government Employees Insurance Co. et al. v. Badia, M.D. et al.</u>, 1:13-cv-01720 (CBA) (VMS) (E.D.N.Y. 2013); <u>Government Employees Insurance Co. et al. v. Prescott et al.</u>, 1:14-cv-00057 (BMC) (E.D.N.Y. 2014). In fact, Zaretskiy was also a named defendant in these two lawsuits. <u>Id.</u>

- Alford Smith, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds; and (iv) referring patients for medically unnecessary testing that was subject to the direction of unlicensed

individuals. <u>See</u> <u>Government Employees Insurance Company et al. v. Smith et al.</u>, 1:19-cv-04882 (DLI) (RML) (E.D.N.Y. 2019).

- Ataul Hakim Chowdhury, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds; (iv) referring patients for medically unnecessary testing that was subject to the direction of unlicensed individuals; and (v) providing the Fraudulent Services through independent contractors rather than employees. In fact, Chowdhury has reportedly engaged in the above activity at the 3910 Church Avenue, Brooklyn Clinic. <u>See</u> <u>Government Employees Insurance Company, et al. v. East Flatbush Medical, P.C., et al.</u>, 1:20-cv-01695 (E.D.N.Y. 2020).

- Alexandr Zaitsev, M.D. – significant history of (i) failing to comply with all significant laws and regulations governing healthcare practices and/or licensing laws; (ii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed solely to financially enrich the medical provider; and (iii) misrepresenting and exaggerating the level of services that were provided to Insureds in order to inflate the charges submitted to the insurer. In fact, Zaitsev has engaged in the above activity at the 108

Kenilworth Place, Brooklyn and 205-20 Jamaica Avenue, Queens Clinics. See Government Employees Insurance Company, et al. v. Alexandr Zaitsev, M.D., et al., 1:20-cv-03495 (E.D.N.Y. 2020).

- Leonid Shapiro, M.D. – significant history of (i) engaging in illegal fee-splitting, kickbacks and referral arrangements; (ii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds; and (iii) referring patients for medically unnecessary testing that was subject to the direction of unlicensed individuals. See State Farm Mutual Automobile Insurance Company et al. v. Metro Pain Specialists P.C. et al., 1:21-cv-05523 (E.D.N.Y. 2021); Allstate Insurance Company et al. v. Metro Pain Specialists Professional Corporation et al., 1:21-cv-05586 (E.D.N.Y. 2021).

- Dominic Onyema, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; and (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insured. In fact, Onyema has engaged in the above activity at the following Clinics: (i) 717 Southern Boulevard, Bronx; (ii) 764 Elmont Road, Elmont; (iii) 2625 Atlantic Avenue, Brooklyn; (iv) 107-48 Guy Brewer Boulevard, Jamaica; and (v) 550 Remsen Avenue, Brooklyn.

See <u>State Farm Mutual Auto. Ins. Co., et al. v. Domny Medical Services, P.C., et al.</u>, 1:18-cv-03129 (E.D.N.Y. 2018).

- Michael Alleyne, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds; and (iv) referring patients for medically unnecessary testing that was subject to the direction of unlicensed individuals. See <u>Government Employees Insurance Company et al. v. Dublin et al.</u>, 1:11-cv-04018 (E.D.N.Y. 2011); <u>Government Employees Insurance Company et al. v. Longevity Medical Supply, Inc. et al.</u>, 1:20-cv-01681 (E.D.N.Y. 2020).

- Barry Dublin, M.D. – significant history of (i) allowing unlicensed individuals to own and operate professional corporations he purportedly owned; (ii) engaging in illegal fee-splitting, kickbacks and referral arrangements; (iii) submitting claims for healthcare services that were not medically necessary and were provided pursuant to predetermined fraudulent protocols designed by unlicensed laypersons for financial gain, not to treat or benefit the Insureds; and (iv) referring patients for medically unnecessary testing that was subject to the direction of unlicensed individuals. In fact, Dublin has engaged in the above activity at the 205-20

Jamaica Avenue, Queens Clinic. See Liberty Mutual Insurance Co., et al. v. Moon Rehab, PT, P.C., et al., 1:17-cv-03803 (E.D.N.Y. 2017).

98.     The Defendants made the various kickback payments in exchange for having Insureds referred to one or more of the Provider Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

99.     The amount of the kickbacks paid by the Defendants generally was based on the volume of Insureds that were steered to the Provider Defendants for the purported medically unnecessary services.

100.     The Nominal Owners had no genuine physician-patient relationship with the Insureds that visited the Clinics, as the patients had no scheduled appointments with the Provider Defendants. Instead, the Insureds were simply directed by Zaretskiy, John Doe Defendants "1" – "10", the Clinics, and/or the unlicensed persons associated therewith, to subject themselves to treatment by whatever physician was working for the Provider Defendants that day, because of the kickbacks paid by the Defendants.

101.     As part of the unlawful kickback and payment scheme, Zaretskiy and John Doe Defendants "1" – "10" would control the finances of the Provider Defendants, by among other things, accessing blank checks from the Provider Defendants accounts, writing checks on behalf of the Provider Defendants and cashing them at check cashing facilities in New Jersey and utilizing funding companies in which Zaretskisy and John Doe Defendants "1" – "10" controlled or where they received a percentage of the no-fault collections involving the Provider Defendants.

102.     The unlawful kickback and payment arrangements were essential to the success of the Defendants' fraudulent scheme.  The Defendants derived significant financial benefit from the

relationships because without access to the Insureds, the Defendants would not have the ability to execute the fraudulent treatment and billing protocol and bill Liberty Mutual and other insurers. At the same time, the voluminous list of healthcare services rendered to Insureds by healthcare providers at the Clinics in connection with the fraudulent claims listed in Exhibits "1" through "11" were enabled by Defendants' performance of the Fraudulent Services.

103.     The Nominal Owners at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

104.     In fact, the Defendants conducted their scheme through multiple medical professional corporations and sole proprietorships using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

**C.     The Defendants' Fraudulent Treatment and Billing Protocol**

105.     Defendants have billed Liberty Mutual and the New York automobile insurance industry for hundreds of thousands of dollars for the performance of these Fraudulent Services.

106.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants, pursuant to the dictates of Zaretskiy and John Doe Defendants "1" – "10", purported to subject Insureds to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentation.

107.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step,

and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

108.    No legitimate physician or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

109.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants sought to profit from the fraudulent billing submitted to Liberty Mutual and other insurers.

### 1.    The Fraudulent Charges for Examinations/Consultations

110.    Upon receiving a referral pursuant to the kickbacks that the Nominal Owners and the Provider Defendants paid to Zaretskiy, John Doe Defendants "1" – "10", the owners, operators, and/or medical professionals that operated from the Clinics, Defendants purported to provide Insureds in the claims identified in Exhibits "1" – "11" with an initial examination/consultation.

111.    In keeping with the fact that the initial examinations/consultations were performed pursuant to the kickbacks that the Nominal Owners and the Provider Defendants paid at the Clinics, the Provider Defendants virtually always purported to perform the initial examinations/consultations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

112.    The initial examinations/consultations were performed as a "gateway" in order to provide Insureds with an excessive number of phony, pre-determined "diagnoses" to allow the Defendants to then purport to provide medically unnecessary, illusory, or otherwise unreimbursable, EMG and NCV tests.

113.     Typically, either the Nominal Owners or someone associated with the Nominal Owners and the Provider Defendants purported to perform the initial examinations/consultations, which were billed to Liberty Mutual through one of the Provider Defendants.

114.     The Defendants typically billed the examinations/consultations under CPT codes: (i) 99204, typically resulting in a charge of $148.69; (ii) 99244, typically resulting in a charge of $236.94; or (iii) 99245, typically resulting in a charge of $299.26 or $410.08.

115.     The charges for the examinations/consultations were fraudulent in that they were medically unnecessary and were performed – to the extent they were performed at all – pursuant to the kickbacks that the Nominal Owners and the Provider Defendants paid at the Clinics in coordination with Zaretskiy and John Doe Defendants "1" - "10", not to treat or otherwise benefit the Insureds.

116.     Furthermore, the charges for the examinations/consultations were fraudulent in that they misrepresented the nature and extent of the examinations/consultations.

117.     In addition, pursuant to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for PIP Benefits, when Defendants submitted charges for examinations/consultations under CPT codes 99204 and 99244, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "moderate complexity."

118.     Moreover, according to the Fee Schedule, when Defendants submitted charges for examinations/consultations under CPT code 99245, they represented that: (i) they took a "comprehensive" patient history; (ii) they conducted a "comprehensive" physical examination; and (iii) they engaged in medical decision-making of "high complexity."

(a)     <u>Misrepresentations Regarding the Performance of Examinations</u>

119.    Pursuant to the Fee Schedule, the use of CPT codes 99244 and 99245 to bill for an initial patient encounter represents that the examining physician performed a "consultation" at the request of another physician or other appropriate source.

120.    However, Defendants did not provide their purported "consultations" – to the extent that they are provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the putative "consultations" were performed in the first instance, they were performed solely as part of Defendants' fraudulent treatment protocol and illegal kickback arrangements.

121.    In keeping with the fact that Defendants did not provide their purported "consultations" at the request of another physician or appropriate source, the supposed "results" of the putative "consultations" were not transmitted back to any referring physicians or other appropriate sources. Nor were the supposed "results" of the putative "consultations" incorporated into any of the Insureds' treatment plans, or otherwise acted upon in any way.

122.    Pursuant to the Fee Schedule, the use of CPT codes 99244 and 99245 to bill for a patient consultation represents that the physician who performed the consultation submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

123.    However, Defendants did not submit any written consultation report to any referring physician or other healthcare provider.

(b)    Misrepresentations Regarding the Amount of Time Spent on the Examinations/Consultations

124.    What is more, in every claim for purported examinations/consultations under CPT codes 99204, 99244 and 99245, Defendants misrepresented and exaggerated the amount of face-to-face time that the examining physicians spend with the Insureds or the Insureds' families.

125.     Pursuant to the Fee Schedule, the use of CPT codes 99244 and 99245 typically requires that the physician spend at least 60 minutes of face-to-face time with the Insured or the Insured's family.

126.     Further, the use of CPT code 99204 typically requires that the physician spend at least 45 minutes of face-to-face time with the Insured or the Insured's family.

127.     Though Defendants routinely billed for the examinations/consultations under CPT codes 99204, 99205 and 99244, no physician associated with Defendants ever spent 45 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 60 minutes. Rather, the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all.

128.     In keeping with the fact that the initial examinations/consultations rarely lasted more than 10-15 minutes, much less 45 or 60 minutes, the Defendants used boilerplate forms in documenting the initial examinations/consultations, setting forth a very limited range of potential patient complaints, examination findings, diagnostic testing options, potential diagnoses, and treatment recommendations.

129.     The checklist forms that Defendants used in purporting to conduct the examinations/consultations set forth a limited range of potential patient complaints, examination findings, diagnostic testing options, potential diagnoses, and treatment recommendations.

130.     All that was required to complete the boilerplate forms was a brief patient interview and a perfunctory physical examination of the Insureds, consisting of basic range of motion, muscle strength, and incomplete neurological testing.

131. These interviews and examinations did not require any physician associated with Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds, let alone 45 or 60 minutes.

132. In the claims for initial examinations/consultations, Defendants falsely represented that the putative examinations/consultations involved at least 45 or 60 minutes of face-to-face time with the Insureds or their families, because consultations that entail at least 45 or 60 minutes of face-to-face time with the Insureds or their families are reimbursable at higher rates than examinations that require less time to perform.

(c)     Misrepresentations Regarding the Severity of the Insureds' Presenting Problems

133. What is more, in the claims for examinations/consultations under CPT codes 99204, 99244 and 99245, Defendants misrepresented the severity of the Insureds' presenting problems.

134. Pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, the use of CPT codes 99204, 99244 and 99245 typically requires that the Insured presented with problems of moderate-to-high severity.

135. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderate to highly severe, and thereby justify the use of CPT codes 99204, 99244 and 99245 to bill for an examination/consultation.

136. Pursuant to the CPT Assistant, the moderate to highly severe presenting problems that could support the use of CPT codes 99204, 99244 and 99245 to bill for an examination/consultation typically are severe problems.

137.    By contrast, to the extent that the Insureds had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

138.    For instance, and in keeping with the fact that the Insureds either had no presenting problems at all as the result of their minor automobile accidents, or else problems of low severity, the Insureds did not seek treatment at any hospital as the result of their accidents.

139.    To the limited extent that the Insureds did seek treatment at a hospital as the result of their accidents, they virtually always were briefly observed on an outpatient basis and released after a few hours with, at most, a minor sprain or strain diagnosis.

140.    To the limited extent that the Insureds experienced any injuries at all as the result of their automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

141.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all.

142.    Even so, in the claims for their purported examinations/consultations, Defendants virtually always billed for the putative examinations/consultations using CPT codes 99204, 99244 and 99245, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

143.    In the claims for purported examinations/consultations, Defendants falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for their charges for the putative examinations/consultations under CPT codes 99204, 99244 and 99245, because evaluations billable under these CPT codes are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

144.     In the claims for purported "consultations" utilizing CPT codes 99244 and 99245, Defendants also falsely represented that the Insureds presented with problems of moderate to high severity to create a false basis for the other Fraudulent Services that Defendants purported to provide to the Insureds, including EMG and NCV tests.

(d)     Misrepresentations Regarding "Comprehensive" Patient Histories

145.     Pursuant to the CPT Assistant, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

146.     Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

147.     As set forth above, the CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)     ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)     respiratory;

(vi)     gastrointestinal;

(vii)     genitourinary;

(viii)     musculoskeletal;

(ix)     integumentary (skin and/or breast);

    (x)    neurological;

    (xi)   psychiatric;

    (xii)  endocrine;

    (xiii) hematologic/lymphatic; and

    (xiv) allergic/immunologic.

148.    When Defendants billed for the examinations/consultations under CPT codes 99204, 99244 and 99245, they falsely represented that a physician took a "comprehensive" patient history from the Insureds.

149.    In fact, no healthcare provider associated with Defendants took a "comprehensive" patient history from the Insureds they purported to treat during the consultations/examinations, because they did not properly document a review of 10 organ systems unrelated to the history of the patients' present illnesses.

150.    Rather, after purporting to provide the consultations, Defendants simply prepared reports containing ersatz patient histories which falsely contended that the Insureds continued to suffer from injuries they sustained in automobile accidents. Even in the unlikely event that an Insured continued to suffer from injuries, there was no adequate neurological history and examination performed to create a foundation for the diagnostic testing or treatment.

151.    These phony patient histories did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the Fraudulent Services that Defendants purported to provide and then billed to Liberty Mutual and other insurers.

    (e)    Misrepresentations Regarding "Comprehensive" Physical Examinations

152.    Moreover, and as set forth above, pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the healthcare provider either: (i)

eva

conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

153.    As set forth above, pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

154.    Furthermore, although Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal system during their putative examinations/consultations, the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – <u>e.g.</u>, development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (<u>e.g.</u>, swelling, varicosities) and palpation (<u>e.g.</u>, pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (<u>e.g.</u>, scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

155.    Though Defendants routinely billed for the examinations/consultations under CPT codes 99204, 99244 and 99245, and thereby falsely represented that they conducted a "comprehensive" physical examination of Insureds during the initial examinations, they did not conduct a general examination of multiple organ systems, inasmuch as they did not document findings with respect to multiple organ systems.

(f)     <u>Misrepresentations Regarding the Extent of Medical Decision-Making</u>

156.    In addition, when Defendants submitted charges for examinations/consultations under CPT codes 99204 or 99244, they represented that they engaged in medical decision-making of "moderate complexity."

157.     Similarly, when Defendants submitted charges for examinations/consultations under CPT code 99245, they represented that they engaged in medical decision-making of "high complexity."

158.     Pursuant to the CPT Assistant, medical decision-making does not qualify as "highly complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of an extensive number of diagnoses or management options; (ii) review of either an extensive amount of data or data that are extensively complex; and/or (iii) presenting problems that carry a high risk of complications and/or morbidity or mortality.

159.     Along similar lines, pursuant to the CPT Assistant, medical decision-making does not qualify as "moderately complex" unless the decision-making meets at least two of the following three criteria: (i) consideration of multiple diagnoses or management options; (ii) review of either a moderate amount of data or data that are moderately complex; and/or (iii) presenting problems that carry a moderate risk of complications and/or morbidity or mortality.

160.     Pursuant to the CPT Assistant, the number of possible diagnoses and/or the number of management options that must be considered is based on the number and types of problems addressed during the encounter, the complexity of establishing a diagnosis, and the management decisions that are made by the physician. In addition, pursuant to the CPT Assistant, the amount and complexity of data that must be reviewed is based on the types of diagnostic testing that are ordered or reviewed. Furthermore, pursuant to the CPT Assistant, the risk of significant complications, morbidity, and/or mortality is based on the risks associated with the presenting problems, the diagnostic procedures, and the possible management options.

161.     Though    Defendants    routinely    falsely    represented    that    their examinations/consultations involved medical decision-making of "high complexity" (when billed

under CPT code 99245) or "moderate complexity" (when billed under CPT codes 99204 or 99244), in actuality the examinations/consultations did not involve any medical decision-making at all.

162. First, the examinations/consultations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to Defendants for "treatment," they did not arrive with any medical records. Furthermore, prior to the examinations/consultations, Defendants neither requested any medical records from any other providers, nor reviewed any diagnostic tests.

163. Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

164. Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Defendants, to the extent that Defendants provided any such diagnostic procedures or treatment options in the first instance. In almost every instance, any diagnostic procedures and "treatments" that Defendants actually provided were limited to a series of medically unnecessary diagnostic tests, none of which were health or life-threatening if properly administered.

165. Third, Defendants did not consider any significant number of diagnoses or treatment options for Insureds during the examinations/consultations.

166. In fact, no physician associated with Defendants engaged in any medical decision-making at all. Rather, the outcome of the examinations/consultations were pre-determined for virtually every Insured to result in phony boilerplate "diagnoses" of sprains and strains.

42

167.     The examinations/consultations did not genuinely reflect the Insureds' actual circumstances, and instead were designed solely to support the laundry-list of Fraudulent Services that Defendants purported to perform and then billed to Liberty Mutual and other insurers.

## 2.     The Fraudulent Charges for Electrodiagnostic Testing

168.     As set forth in Exhibits "1" - "11" the Defendants also purported to subject Insureds to a series of medically unnecessary and useless NCV and EMG tests (collectively "EDX tests").

169.     The charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed pursuant to the kickbacks that the Nominal Owners and the Provider Defendants paid at the Clinics in coordination with Zaretskiy and John Doe Defendants "1"–"10", not to treat or otherwise benefit the Insureds.

170.     Indeed, physicians who purported to render the Fraudulent Services to Insureds on behalf of the Defendants are no strangers to this very type of fraudulent scheme. For example, Slukhinsky, Hadassah Lee Orenstein, M.D. ("Orenstein") and Jean Baptiste-Simeon, M.D. ("Baptiste-Simeon") have been involved in the performance of medically unnecessary EDX testing, misrepresenting and exaggerating the level of services provided in order to inflate the charges for the EDX testing, and performing the EDX testing as independent contractors of various medical professional corporations. See Liberty Mutual Insurance Company, et al. v. Noel Blackman, M.D., et al., 609667/2016 (Sup. Ct. Nassau County).

(a)     The Human Nervous System and Electrodiagnostic Testing

171.     The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, including, the arms and legs and into the hands and feet.  Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit

signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

172.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  The peripheral nervous system consists of both sensory and motor nerves.  They carry electrical impulses throughout the body, from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

173.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.  A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs, including pain, altered sensation, altered reflexes on examination, and loss of muscle control.

174.    EMG and NCV tests are forms of electrodiagnostic tests, and purportedly were provided by the Defendants because they were medically necessary to determine whether the Insureds had radiculopathies.

175.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

176.    The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical

organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

(b)     The Fraudulent NCVs

177.    NCV tests are non-invasive tests in which peripheral nerves, including those in the arms and legs, are stimulated with an electrical impulse to cause the nerve to depolarize.  The depolarization, or "firing", of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin.

178.    An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus location to another (the "conduction velocity").

179.    In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform".  The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

180.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests.  Moreover, most of these peripheral nerves have both sensory and motor nerve fibers either or both of which can be tested with NCV tests.

181.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests.  F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again.  The motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

182.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

183.    In an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Defendants routinely purported to test far more nerves than recommended by the Recommended Policy, and then submitted billing to Liberty Mutual through the Provider Defendants.

184.    Specifically, to maximize the fraudulent charges that they could submit to Liberty Mutual and other insurers, Defendants, pursuant to the dictates of Zaretskiy and John Doe Defendants "1" – "10", routinely purported to perform: (i) NCV tests of 8-10 motor nerves; (ii) NCV tests of 10-12 sensory nerves; and (iii) two H-reflex studies.

185.    Therefore, where the Fee Schedule and Recommended Policy would limit billing by Defendants for NCV testing of one Insured to approximately $950.00, representing NCVs of three motor nerves, NCVs of two sensory nerves, and two H-reflex studies, Defendants routinely submitted NCV billing to Liberty Mutual for more than $2,635.48 – $4,553.59 per Insured.

186.    For instance:

(i)     On or about July 17, 2019, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "A.S." Defendants then submitted the bill to Liberty Mutual through Gutterman PC for a total of $2,636.44 worth of billing for NCV tests.

(ii)    On or about January 8, 2020, Defendants purportedly performed: (i) NCV tests of ten motor nerves; (ii) NCV tests of twelve sensory nerves; and (iii) two H-reflex studies on an Insured named "W.V." Defendants then submitted the bill to Liberty Mutual through Gutterman PC for a total of $3,062.32 worth of billing for NCV tests.

(iii)   On or about March 5, 2020, Defendants purportedly performed: (i) NCV tests of ten motor nerves; (ii) NCV tests of twelve sensory nerves; and (iii)

two H-reflex studies on an Insured named "T.B." Defendants then submitted the bill to Liberty Mutual through Gutterman PC for a total of $3,062.32 worth of billing for NCV tests.

(iv)     On or about January 19, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "T.C." Defendants then submitted the bill to Liberty Mutual through Baldo Wellness for a total of $2,636.44 worth of billing for NCV tests.

(v)      On or about February 22, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "G.B." Defendants then submitted the bill to Liberty Mutual through Baldo Wellness for a total of $2,636.44 worth of billing for NCV tests.

(vi)     On or about February 8, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "D.G." Defendants then submitted the bill to Liberty Mutual through Bronx Medical for a total of $2,636.44 worth of billing for NCV tests.

(vii)    On or about May 22, 2019, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of twelve sensory nerves; and (iii) two H-reflex studies on an Insured named "M.S." Defendants then submitted the bill to Liberty Mutual through Bronx Medical for a total of $3,062.32 worth of billing for NCV tests.

(viii)   On or about July 28, 2020, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "P.A." Defendants then submitted the bill to Liberty Mutual through Bronx Medical for a total of $2,635.50 worth of billing for NCV tests.

(ix)     On or about June 6, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "J.C." Defendants then submitted the bill to Liberty Mutual through Fray PC for a total of $2,636.44 worth of billing for NCV tests.

(x)      On or about February 16, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "A.E." Defendants then submitted the bill to Liberty Mutual through Fray PC for a total of $2,636.48 worth of billing for NCV tests.

(xi)     On or about July 12, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "M.J." Defendants then submitted the bill to Liberty Mutual through Classic Medical for a total of $2,636.44 worth of billing for NCV tests.

(xii)    On or about January 10, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "A.P." Defendants then submitted the bill to Liberty Mutual through Classic Medical for a total of $2,636.44 worth of billing for NCV tests.

(xiii)   On or about April 9, 2019, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "C.R." Defendants then submitted the bill to Liberty Mutual through Classic Medical for a total of $2,636.44 worth of billing for NCV tests.

(xiv)    On or about December 26, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "V.A." Defendants then submitted the bill to Liberty Mutual through Eleyinafe Medical for a total of $2,636.44 worth of billing for NCV tests.

(xv)     On or about April 17, 2019, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "O.R." Defendants then submitted the bill to Liberty Mutual through Eleyinafe Medical for a total of $2,636.44 worth of billing for NCV tests.

(xvi)    On or about May 17, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "G.R." Defendants then submitted the bill to Liberty Mutual through Galmar Diagnostic for a total of $2,636.44 worth of billing for NCV tests.

(xvii)   On or about July 19, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "P.A." Defendants then submitted the bill to Liberty Mutual through Galmar Diagnostic for a total of $2,636.44 worth of billing for NCV tests

(xviii)  On or about June 2, 2020, Defendants purportedly performed: (i) NCV tests of ten motor nerves; (ii) NCV tests of twelve sensory nerves; and (iii) two H-reflex studies on an Insured named "V.E." Defendants then submitted the

bill to Liberty Mutual through GM Medical for a total of $3,062.32 worth of billing for NCV tests.

(xix)   On or about September 30, 2020, Defendants purportedly performed: (i) NCV tests of ten motor nerves; (ii) NCV tests of twelve sensory nerves; and (iii) two H-reflex studies on an Insured named "C.J." Defendants then submitted the bill to Liberty Mutual through GM Medical for a total of $3,062.32 worth of billing for NCV tests.

(xx)   On or about October 27, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "D.D." Defendants then submitted the bill to Liberty Mutual through GM Wellness for a total of $2,636.44 worth of billing for NCV tests.

(xxi)   On or about December 10, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "D.T." Defendants then submitted the bill to Liberty Mutual through GM Wellness for a total of $2,636.44 worth of billing for NCV tests.

(xxii)   On or about May 1, 2019, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "A.B." Defendants then submitted the bill to Liberty Mutual through GM Wellness for a total of $2,636.44 worth of billing for NCV tests.

(xxiii)   On or about November 10, 2020, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "P.M." Defendants then submitted the bill to Liberty Mutual through Gotham Medicine for a total of $4,553.59 worth of billing for NCV tests.

(xxiv)   On or about January 6, 2021, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "R.S." Defendants then submitted the bill to Liberty Mutual through Gotham Medicine for a total of $4,553.59 worth of billing for NCV tests.

(xxv)   On or about December 14, 2016, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "D.A." Defendants then submitted the bill to Liberty Mutual through MAG Medical for a total of $2,636.44 worth of billing for NCV tests.

(xxvi)  On or about December 28, 2016, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "E.P." Defendants then submitted the bill to Liberty Mutual through MAG Medical for a total of $2,636.44 worth of billing for NCV tests.

(xxvii) On or about January 13, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "E.L." Defendants then submitted the bill to Liberty Mutual through MG Medical for a total of $2,636.44 worth of billing for NCV tests.

(xxviii)On or about November 2, 2017, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "C.J." Defendants then submitted the bill to Liberty Mutual through MG Medical for a total of $2,636.44 worth of billing for NCV tests.

(xxix)  On or about February 4, 2020, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "L.S." Defendants then submitted the bill to Liberty Mutual through Ralph Medical for a total of $2,636.44 worth of billing for NCV tests.

(xxx)   On or about August 13, 2020, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "A.B." Defendants then submitted the bill to Liberty Mutual through Ralph Medical for a total of $2,636.44 worth of billing for NCV tests.

(xxxi)  On or about August 29, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "P.G." Defendants then submitted the bill to Liberty Mutual through Unincorporated Sabodash Provider for a total of $2,636.44 worth of billing for NCV tests.

(xxxii) On or about October 25, 2018, Defendants purportedly performed: (i) NCV tests of eight motor nerves; (ii) NCV tests of ten sensory nerves; and (iii) two H-reflex studies on an Insured named "B.C." Defendants then submitted the bill to Liberty Mutual through Unincorporated Sabodash Provider for a total of $2,636.44 worth of billing for NCV tests.

187.   What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

188.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

189.   As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

190.   This concept is emphasized in the Recommended Policy, which states that:

> EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

191.   This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

192.   Even so, Defendants did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

193.   Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCV tests on the same peripheral nerves and nerve fibers.

194.   In particular, the Provider Defendants routinely purported to test some combination of the following peripheral nerves and nerve fibers (and in most cases, all of them) in the NCV tests identified in Exhibits "1" – "11":

(i)      left and right median motor nerves;

(ii)     left and right peroneal motor nerves;

(iii)    left and right tibialis or post-tibialis motor nerves;

(iv)     left and right ulnar motor nerves;

(v)      left and right median sensory nerves;

(vi)     left and right radial sensory nerves;

(vii)    left and right superficial peroneal sensory nerves;

(viii)   left and right sural sensory nerves; and

(ix)     left and right ulnar sensory nerves.

195.    Though the NCVs are allegedly rendered to Insureds in order to determine whether the Insureds suffered from radiculopathies, there was no adequate neurological history and examination performed to create a foundation for the EDX testing. In actuality, NCV tests were provided to Insureds – to the extent that they provided them at all – as part of the pre-determined, fraudulent treatment protocol designed to maximize the billing that could be submitted for each Insured.

196.    The cookie-cutter approach to the NCV tests that Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCV tests was designed solely to maximize the charges that Defendants could submit to Liberty Mutual and other insurers, and to maximize their ill-gotten profits.

(c)      The Fraudulent EMG Tests

197.    As part of their pre-determined fraudulent treatment and billing protocol, the Defendants, pursuant to the dictates of Zaretskiy and the John Doe Defendants "1" – "10", also purported to provide medically unnecessary EMGs to virtually all Insureds who received NCV tests.  The Defendants submitted billing for the fraudulent EMGs through the Provider Defendants.

198.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such

muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

199.    Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies. Defendants did not take a proper history or examination of Insureds that would indicate radiculopathy symptoms or signs or any other medical problems arising from any automobile accidents.

200.    To the extent that Defendants purported to provide EMG tests to Insureds at all, the tests were provided pursuant to the illegal kickback and referral schemes and fraudulent treatment protocol dictated by Zaretskiy and John Doe Defendants "1" – "10", not to treat or otherwise benefit the Insureds.

201.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient-to-patient.

202.    Even so, Defendants did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, Defendants routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

203.    Furthermore, even if there were any need for any of these EMG tests, the nature and number of the EMG tests that Defendants purported to provide and/or perform grossly exceed

the maximum number of such tests that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

204.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

205.    Nonetheless, Defendants, pursuant to the dictates of Zaretskiy and John Doe Defendants "1" – "10", purported to provide and/or perform EMG tests on four limbs in contravention of the Recommended Policy, solely in order to maximize the fraudulent billing that they could submit to Liberty Mutual.

206.    In keeping with the fact that the Defendants performed the Fraudulent Services pursuant to a fraudulent, predetermined treatment and billing protocol designed solely to maximize profit, the Defendants performed (or purported to perform) the EMG and NCV tests immediately following the initial examination/consultation. A proper neurological history and examination followed by a thoroughly conducted four-limb EMG and NCV test would require the Defendants to spend at least two hours with each patient.   The fact that each of the patients purportedly subjected to the fraudulent EMG and NCV tests set aside at least two hours to receive a neurological examination and EMG and NCV tests indicates that either: (i) the patients knew in advance that they were to receive the EMG and NCV tests because the EMG and NCV tests were rendered pursuant to a *pre-determined* treatment protocol, or (ii) the Fraudulent Services were not actually performed as billed.

(d)    The Fraudulent "Radiculopathy" Diagnoses

207.    Radiculopathies – disorders of spinal nerve roots – are relatively low frequency in motor vehicle accident victims, occurring in – at most – 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H.

Rivner, M.D., and Lawrence Spitz, M.D. and published in <u>Muscle & Nerve</u>, the official journal of the AANEM.

208.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom Defendants purportedly treated.

209.    As a result, the frequency of radiculopathy in <u>all</u> motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is likely to be significantly lower than 19 percent.

210.    Virtually none of the Insureds whom Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathy. In fact, in the unlikely event that an Insured did present with such problems or symptoms, the deficient initial consultations were incapable of assessing and/or diagnosing them.

211.    Even so, the Defendants falsely purported to diagnose radiculopathies in Insureds that purportedly received EMG/NCV tests from the Defendants. In fact, a physician advised Liberty Mutual that Zaretskiy and John Doe Defendants "1" – "10" fabricated the billing to conclude that virtually all patients suffered from radiculopathy or had some other positive diagnostic finding to justify continued treatment.

212.    The Defendants purported to arrive at their pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services.

**D.    The Fraudulent Billing for Independent Contractor Services**

213.    The Defendants' fraudulent scheme also included submission of claims to Liberty Mutual on behalf of the Provider Defendants seeking payment for services provided by independent contractors.

214.    Under the New York no-fault insurance laws, professional corporations are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

215.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). See Exhibit "12".

56

216.    The Defendants routinely submitted charges to Liberty Mutual and other insurers for Fraudulent Services that purportedly were performed by physicians other than the Nominal Owners.

217.    The physicians and technicians working under the names of the Provider Defendants set their own work schedules or had their schedules set for them by Zaretskiy and the John Doe Defendants "1" – "10."  In fact, Zaretskiy hired most, if not all, the physicians working under the names of the Provider Defendants.

218.    The physicians working under the names of the Provider Defendants worked without any supervision by the Nominal Owners but rather were directed by Zaretskiy and the John Doe Defendants "1" – "10" instead. In fact, the Nominal Owners never even met some of the physicians purportedly rending treatment as an "employee" of the Provider Defendants.

219.    The physicians and technicians working under the names of the Provider Defendants did not exclusively provide their services for just one of the Provider Defendants.  In fact, Zaretskiy and the John Doe Defendants "1" – "10" directed the physicians to work at other healthcare practices, most notably between and among the Provider Defendants.

220.    For example, Orenstein, Hong Pak, M.D., Michael Alleyne, M.D., Sheila Soman, M.D. and John Hannan, M.D. were directed by Zaretskiy and John Doe Defendants "1" – "10" to perform services at Gutterman PC, GM Wellness, GM Medical, Ralph Medical, Baldo Wellness, Fray PC, Galmar Diagnostic, MG Medical and the Unincorporated Sabodash Provider.

221.    Furthermore, Orenstein, Ivan Lam, D.C. ("Lam") and Baptiste-Simeon, pursuant to the directive of Zaretskiy and the John Doe Defendants "1" – "10" are rendering Fraudulent Services to Galea's professional corporations – Galmar Diagnostic, MAG Medical, and MG Medical. Significantly, Orenstein, Lam, and/or Baptiste-Simone are also providing the Fraudulent

Services, pursuant to Zaretskiy and the John Doe Defendants "1" – "10", for Fray PC, GM Medical, Gutterman PC, and the Unincorporated Sabodash Provider.

222.     Furthermore, some of the Nominal Owners have also rendered the Fraudulent Services on behalf of the Provider Defendants which they have no ownership interest in. For example, Slukhinsky – in addition to the Fraudulent Services allegedly rendered through Classic Medical – has also rendered the Fraudulent Services, pursuant to Zaretskiy's and John Doe Defendants "1" – "10" directive, for Baldo Wellness and Ralph Medical. Moreover, Baldonado – in addition to the Fraudulent Services allegedly rendered through Baldo Wellness – has also rendered services for Gutterman PC.

223.     Zaretskiy and the John Doe Defendants "1" – "10" also submitted billing to Liberty Mutual through certain Provider Defendants listing these "employee" physicians as the treating provider, yet these "employee" physicians never performed the Fraudulent Services. In fact, a physician allegedly rendering treatment from Gutterman PC, GM Medical, Galmar Diagnostic and the Unincorporated Sabodash Provider averred that they never provided Fraudulent Services on behalf of these entities and never signed the bills indicating they provided such services on behalf of these entities.

224.     To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare service providers other than the Nominal Owners were performed by physicians whom the Defendants treated as independent contractors.

225.     For instance, the Defendants:

      (i)     paid the physicians and technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

      (ii)    established an understanding with the physicians and technicians that they were independent contractors, rather than employees;

      (iii)     paid no employee benefits to the physicians and technicians;

      (iv)     failed to secure and maintain W-4 or I-9 forms for the physicians and technicians;

      (v)     failed to withhold federal, state, or city taxes on behalf of the physicians and technicians;

      (vi)     compelled the physicians to pay for their own malpractice insurance at their own expense;

      (vii)     permitted the physicians and technicians to set their own schedules and days on which they desired to perform services;

      (viii)     permitted the physicians and technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other practices;

      (ix)     failed to cover the physicians for either unemployment or workers' compensation benefits; and

      (x)     filed corporate and payroll tax returns (e.g., Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians and unlicensed technicians were independent contractors.

226.    By electing to treat the physicians and technicians as independent contractors, the

Defendants realized significant economic benefits – for instance:

      (i)     avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

      (ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

      (iii)     avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

      (iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

      (v)     avoiding the need to secure any malpractice insurance; and

      (vi)     avoiding claims of agency-based liability arising from work performed by the physicians.

227.    Because the physicians and technicians were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill or collect PIP Benefits in connection with those services.

228.    The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement.

229.    The Defendants' misrepresentations were consciously designed to mislead Liberty Mutual into believing that it was obligated to pay for these services, when in fact Liberty Mutual was not.

**E.      The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to Liberty Mutual**

230.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and treatment reports through the Provider Defendants to Liberty Mutual seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

231.    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to Liberty Mutual by and on behalf of the Defendants were false and misleading in the following material respects:

> (i)     The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were medically necessary.  In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

> (ii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated

the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

(iv)    With the exception of NF-3 forms, HCFA-1500 forms, and treatment reports covering services actually performed by the Nominal Owners, the NF-3 forms, HCFA-1500 forms, and treatment reports submitted by, and on behalf of, the Defendants uniformly misrepresented to Liberty Mutual that the Defendants were eligible to receive PIP Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed.  In fact, the Defendants were not eligible to seek or pursue collection of PIP Benefits for the services that supposedly were performed because the services were provided by independent contractors, to the extent they were provided at all.

## III.    Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance

232.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to Liberty Mutual.

233.    To induce Liberty Mutual to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

234.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

235.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

236.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

237.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians associated with the Provider Defendants in order to prevent Liberty Mutual from discovering that the physicians performing many of the Fraudulent Services were not employed by the Provider Defendants.

238.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification number, thereby preventing Liberty Mutual from identifying the pattern of fraudulent charges submitted through any one entity.

239.    In accordance with the New York no-fault insurance laws, and Liberty Mutual's standard office practices and procedures, Liberty Mutual either: (i) timely and appropriately denied the pending claims for PIP Benefits submitted through the Provider Defendants; (ii) timely issued requests for additional verification with respect to the pending claims for PIP Benefits submitted through the Provider Defendants; (iii) timely issued payment with respect to the claims submitted through the Provider Defendants; or else (iv) the time in which to pay or deny the pending claims for PIP Benefits submitted through the Provider Defendants, or to request additional verification of those claims, has not expired.

240.     The Defendants hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full.

241.     Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them.  As a result, Liberty Mutual incurred damages of more than $549,000.00 based upon the fraudulent charges.

242.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

243.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

244.     There is an actual case and controversy between Liberty Mutual and the Defendants regarding more than $500,000.00 in fraudulent billing for the Fraudulent Services that have been submitted to Liberty Mutual through the Provider Defendants.

245.     The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all –

pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

246.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

247.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others.

248.    The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by employees of the Provider Defendants.

249.    Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual under the names of the Provider Defendants.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Zaretskiy and Menczelesz**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

250.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

251.    GM Wellness is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

252.    Zaretskiy and Menczelesz knowingly have conducted and/or participated, directly or indirectly, in the conduct of GM Wellness's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that GM Wellness was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) GM Wellness obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by GM Wellness employees. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

253.    GM Wellness's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Zaretskiy and Menczelesz operate GM Wellness, insofar as GM Wellness is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for GM Wellness to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the

fact that the Defendants continue to attempt collection on the fraudulent billing submitted by GM Wellness to the present day.

254.    GM Wellness is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers.  These inherently unlawful acts are taken by GM Wellness in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

255.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $95,000.00 pursuant to the fraudulent bills submitted through GM Wellness.

256.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against Menczelesz and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

257.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

258.    GM Wellness is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

259.    Menczelesz and Zaretskiy are employed by or associated with the GM Wellness enterprise.

260.    Menczelesz and Zaretskiy knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of GM Wellness' affairs through a

pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that GM Wellness was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) GM Wellness obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by GM Wellness's employees.  The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

261.   Menczelesz and Zaretskiy knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

262.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $95,000.00 pursuant to the fraudulent bills submitted through GM Wellness.

263.   By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Menczelesz, Zaretskiy and GM Wellness**
**(Common Law Fraud)**

264. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

265. Menczelesz, Zaretskiy and GM Wellness intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of his submission of fraudulent bills seeking payment for the Fraudulent Services submitted through the GM Wellness.

266. The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Menczelesz, the representation that the billed for services were performed by GM Wellness employees, when in fact the billed-for-services submitted by GM Wellness were performed by independent contractors.

267.    Menczelesz, Zaretskiy and GM Wellness intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through GM Wellness that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "1".

268.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $95,000.00 pursuant to the fraudulent bills submitted through GM Wellness.

269.    Menczelesz, Zaretskiy and GM Wellness's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

270.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Menczelesz, Zaretskiy and GM Wellness
### (Unjust Enrichment)

271.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

272.    As set forth above, Menczelesz, Zaretskiy and GM Wellness has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

273.    When Liberty Mutual paid the bills and charges submitted by or on behalf of GM Wellness for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

274.    Menczelesz, Zaretskiy and GM Wellness has been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Menczelesz, Zaretskiy and GM Wellness voluntarily accepted and distributed amongst himself notwithstanding the improper, unlawful, and unjust billing scheme.

275.    Menczelesz, Zaretskiy and GM Wellness's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

276.    By reason of the above, Menczelesz, Zaretskiy and GM Wellness has been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $95,000.00.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

277.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

278.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Menczelesz and Zaretskiy using GM Wellness.

279.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to GM Wellness in exchange for illegal kickbacks from Menczelesz and GM Wellness and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

280.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their

actions, there would have been no opportunity for Menczelesz and GM Wellness to obtain payment from Liberty Mutual and other insurers.

281.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Menczelesz and GM Wellness for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

282.    The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $95,000.00 pursuant to the fraudulent bills submitted through GM Wellness.

283.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

284.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Menczelesz, Zaretskiy and GM Medical
### (Common Law Fraud)

285.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

286.    Menczelesz, Zaretskiy and GM Medical intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of GM Medical.

287.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were

medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Menczelesz, the representation that the billed for services were performed by GM Medical's employees, when in fact the billed-for-services submitted by GM Medical were performed by independent contractors.

288.   Menczelesz, Zaretskiy and GM Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through GM Medical that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "2".

289.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $44,000.00 pursuant to the fraudulent bills submitted through GM Medical.

290.     Menczelesz, Zaretskiy and GM Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

291.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Menczelesz, Zaretskiy and GM Medical
### (Unjust Enrichment)

292.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

293.     As set forth above, Menczelesz, Zaretskiy and GM Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

294.     When Liberty Mutual paid the bills and charges submitted by or on behalf of GM Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

295.     Menczelesz, Zaretskiy and GM Medical have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Menczelesz and GM Medical voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

296.     Menczelesz, Zaretskiy and GM Medical's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

297.     By reason of the above, Menczelesz, Zaretskiy and GM Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $44,000.00.

## AS AND FOR A NINTH CAUSE OF ACTION
### Against John Doe Defendants "1"- "10"
### (Aiding and Abetting Fraud)

298.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

299.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Menczelesz, Zaretskiy and GM Medical.

300.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to GM Medical in exchange for illegal kickbacks from Menczelesz and GM Medical and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

301.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Menczelesz and GM Medical to obtain payment from Liberty Mutual and other insurers.

302.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Menczelesz and GM Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

303.    The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $44,000.00 pursuant to the fraudulent bills submitted through GM Medical.

304.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

305.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TENTH CAUSE OF ACTION
**Against Fray and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

306.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

307.     Fray PC is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

308.     Fray and Zaretskiy knowingly have conducted and/or participated, directly or indirectly, in the conduct of Fray PC's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Fray PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Fray PC obtained its patients

through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Fray PC employees. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

309.    Fray PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Fray and Zaretskiy operate Fray PC, insofar as Fray PC is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Fray PC to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity.

310.    Fray PC is engaged in inherently unlawful acts towards Liberty Mutual and other insurers.  These inherently unlawful acts are taken by Fray PC in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

311.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $93,000.00 pursuant to the fraudulent bills submitted through Fray PC.

312.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**<u>AS AND FOR AN ELEVENTH CAUSE OF ACTION</u>**
**Against Fray and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

313.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

314.    Fray PC is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

315.    Fray and Zaretskiy are employed by or associated with the Fray PC enterprise.

316.    Fray and Zaretskiy knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Fray PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Fray PC was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Fray PC obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Fray PC's employees.  The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

317.    Fray and Zaretskiy knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

318.	Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $93,000.00 pursuant to the fraudulent bills submitted through Fray PC.

319.	By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TWELFTH CAUSE OF ACTION**
**Against Fray, Zaretskiy and Fray PC**
**(Common Law Fraud)**

320.	Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

321.	Fray and Zaretskiy intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of his submission of fraudulent bills seeking payment for the Fraudulent Services submitted through the Fray PC.

322.	The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst

Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Fray, the representation that the billed for services were performed by Fray PC employees, when in fact the billed-for-services submitted by Fray PC were performed by independent contractors.

323.    Fray intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Fray PC that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "3".

324.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $93,000.00 pursuant to the fraudulent bills submitted through Fray PC.

325.    Fray's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

326.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
**Against Fray, Zaretskiy and Fray PC**
**(Unjust Enrichment)**

327.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

328.    As set forth above, Fray and Zaretskiy have engaged in improper, unlawful, and/or unjust acts, using Fray PC, all to the harm and detriment of Liberty Mutual.

329.    When Liberty Mutual paid the bills and charges submitted by or on behalf of the Fray PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

330.    Fray and Zaretskiy have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Fray and Zaretskiy voluntarily accepted and distributed amongst himself notwithstanding the improper, unlawful, and unjust billing scheme.

331.    Fray and Zaretskiy's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

332.    By reason of the above, Fray and Zaretskiy have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $93,000.00.

**AS AND FOR A FOURTEENTH CAUSE OF ACTION**
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

333.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

334.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Fray and Zaretskiy, using Fray PC.

335.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Fray PC in exchange for illegal kickbacks from Fray and Fray PC and knowingly participating and assisting in subjecting the

Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

336.   The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Fray to obtain payment from Liberty Mutual and other insurers using Fray PC.

337.   John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Fray PC for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

338.   The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $93,000.00 pursuant to the fraudulent bills submitted through Fray PC.

339.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

340.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
**Against Galea, Zaretskiy and Galmar Diagnostic**
**(Common Law Fraud)**

341.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

342.    Galea, Zaretskiy and Galmar Diagnostic intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of his submission of fraudulent bills seeking payment for the Fraudulent Services submitted through Galmar Diagnostic.

343.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Galea, the representation that the billed for services were performed by Galmar Diagnostic's employees, when in fact the billed-for-services submitted by Galmar Diagnostic were performed by independent contractors.

344.    Galea, Zaretskiy and Galmar Diagnostic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Galmar Diagnostic that were not compensable under the

New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "4".

345.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,000.00 pursuant to the fraudulent bills submitted through Galmar Diagnostic.

346.    Galea, Zaretskiy and Galmar Diagnostic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

347.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
**Against Galea, Zaretskiy and Galmar Diagnostic**
**(Unjust Enrichment)**

348.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

349.    As set forth above, Galea, Zaretskiy and Galmar Diagnostic have engaged in improper, unlawful, and/or unjust acts all to the harm and detriment of Liberty Mutual.

350.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Galmar Diagnostic for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

351.    Galea, Zaretskiy and Galmar Diagnostic have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Galea, Zaretskiy and

Galmar Diagnostic voluntarily accepted and distributed amongst herself notwithstanding the improper, unlawful, and unjust billing scheme.

352.    Galea, Zaretskiy and Galmar Diagnostic's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

353.    By reason of the above, Galea and Zaretskiy have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $3,000.00.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
### Against John Doe Defendants "1"- "10"
### (Aiding and Abetting Fraud)

354.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

355.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Galea and Zaretskiy, using Galmar Diagnostic.

356.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Galmar Diagnostic in exchange for illegal kickbacks from Galea and Galmar Diagnostic and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

357.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their

actions, there would have been no opportunity for Galea and Galmar Diagnostic to obtain payment from Liberty Mutual and other insurers.

358.     John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Galea and Galmar Diagnostic for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

359.     The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $3,000.00 pursuant to the fraudulent bills submitted through Galmar Diagnostic.

360.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

361.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
### Against Galea, Zaretskiy and MAG Medical
### (Common Law Fraud)

362.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

363.     Galea, Zaretskiy and MAG Medical intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of MAG Medical.

364.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were

medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Galea, the representation that the billed for services were performed by MAG Medical's employees, when in fact the billed-for-services submitted by MAG Medical were performed by independent contractors.

365.    Galea, Zaretskiy and MAG Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through MAG Medical that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "5".

366.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $29,000.00 pursuant to the fraudulent bills submitted through MAG Medical.

367.     Galea, Zaretskiy and MAG Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

368.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### Against Galea, Zaretskiy and MAG Medical
### (Unjust Enrichment)

369.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

370.     As set forth above, Galea, Zaretskiy and MAG Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

371.     When Liberty Mutual paid the bills and charges submitted by or on behalf of MAG Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

372.     Galea and MAG Medical have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Galea, Zaretskiy and MAG Medical voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

373.     Galea, Zaretskiy and MAG Medical's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

374.     By reason of the above, Galea, Zaretskiy and MAG Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $29,000.00.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
### Against John Doe Defendants "1"- "10"
### (Aiding and Abetting Fraud)

375.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

376.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Galea and Zaretskiy, using MAG Medical.

377.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to MAG Medical in exchange for illegal kickbacks from Galea and MAG Medical and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

378.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Galea and MAG Medical to obtain payment from Liberty Mutual and other insurers.

379.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Galea and MAG Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

380.    The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $29,000.00 pursuant to the fraudulent bills submitted through MAG Medical.

381.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

382.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Against Galea, Zaretskiy and MG Medical**
**(Common Law Fraud)**

383.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

384.     Galea, Zaretskiy and MG Medical intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of MG Medical.

385.     The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the

Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Galea, the representation that the billed for services were performed by MG Medical's employees, when in fact the billed-for-services submitted by MG Medical were performed by independent contractors.

386.    Galea, Zaretskiy and MG Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through MG Medical that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "6".

387.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $18,000.00 pursuant to the fraudulent bills submitted through MG Medical.

388.    Galea, Zaretskiy and MG Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

389.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-SECOND CAUSE OF ACTION**
**Against Galea, Zaretskiy and MG Medical**
**(Unjust Enrichment)**

390.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

391.    As set forth above, Galea, Zaretskiy and MG Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

392.    When Liberty Mutual paid the bills and charges submitted by or on behalf of MG Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

393.    Galea, Zaretskiy and MG Medical have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Galea and MG Medical voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

394.    Galea, Zaretskiy and MG Medical's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

395.    By reason of the above, Galea, Zaretskiy and MG Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $18,000.00.

### AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
#### Against John Doe Defendants "1"- "10"
#### (Aiding and Abetting Fraud)

396.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

397.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Galea and Zaretskiy, using MG Medical.

398.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to MG Medical in exchange for illegal kickbacks from Galea and MG Medical and knowingly participating and assisting in subjecting the

Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

399.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Galea and MG Medical to obtain payment from Liberty Mutual and other insurers.

400.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Galea and MG Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

401.    The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $18,000.00 pursuant to the fraudulent bills submitted through MG Medical.

402.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

403.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION**
**Against Slukhinsky and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

404.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

405.     Classic Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

406.     Slukhinsky and Zaretskiy knowingly have conducted and/or participated, directly or indirectly, in the conduct of Classic Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since its inception seeking payments that Classic Medical was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Classic Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Classic Medical employees. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "7".

407.     Classic Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Slukhinsky and Zaretskiy operates Classic Medical, insofar as Classic Medical is not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Classic Medical to function.  Furthermore, the intricate planning required to

carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Classic Medical to the present day.

408.    Classic Medical is engaged in inherently unlawful acts towards Liberty Mutual and other insurers. These inherently unlawful acts are taken by Classic Medical in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

409.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted through Classic Medical.

410.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
**Against Slukhinsky and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

411.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

412.    Classic Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

413.    Slukhinsky and Zaretskiy are employed by or associated with the Classic Medical enterprise.

414.    Slukhinsky and Zaretskiy knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Classic Medical's affairs through

a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Classic Medical was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Classic Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Classic Medical's employees.  The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "7".

415.   Slukhinsky and Zaretskiy knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

416.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted through Classic Medical.

417.   By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A TWENTY-SIXTH CAUSE OF ACTION**
**Against Slukhinsky, Zaretskiy and Classic Medical**
**(Common Law Fraud)**

418.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

419.    Slukhinsky and Classic Medical intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Classic Medical.

420.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Slukhinsky, the representation that the billed for services were performed by Classic Medical's employees, when in fact the billed-for-services submitted by Classic Medical were performed by independent contractors.

421.    Slukhinsky, Zaretskiy and Classic Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Classic Medical that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "7".

422.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted through Classic Medical.

423.    Slukhinsky, Zaretskiy and Classic Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

424.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-SEVENTH CAUSE OF ACTION
**Against Slukhinsky, Zaretskiy and Classic Medical**
**(Unjust Enrichment)**

425.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

426.    As set forth above, Slukhinsky, Zaretskiy and Classic Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

427.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Classic Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

428.    Slukhinsky, Zaretskiy and Classic Medical have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Slukhinsky, Zaretskiy and Classic Medical voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

429.    Slukhinsky, Zaretskiy and Classic Medical's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

430.    By reason of the above, Slukhinsky, Zaretskiy and Classic Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $94,000.00.

### AS AND FOR A TWENTY-EIGHTH CAUSE OF ACTION
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

431.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

432.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Slukhinsky and Zaretskiy, using Classic Medical.

433.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Classic Medical in exchange for illegal kickbacks from Slukhinsky and Classic Medical and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

434.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their

actions, there would have been no opportunity for Slukhinsky and Classic Medical to obtain payment from Liberty Mutual and other insurers.

435.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Slukhinsky and Classic Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

436.    The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $94,000.00 pursuant to the fraudulent bills submitted through Classic Medical.

437.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

438.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A TWENTY-NINTH CAUSE OF ACTION
**Against Zaretskiy and Gutterman PC**
**(Common Law Fraud)**

439.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

440.    Zaretskiy and Gutterman PC intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Gutterman PC.

441.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were

medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, the representation that the billed for services were performed by Gutterman PC's employees, when in fact the billed-for-services submitted by Gutterman PC were performed by independent contractors.

442.     Zaretskiy and Gutterman PC intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Gutterman PC that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "8".

443.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $65,000.00 pursuant to the fraudulent bills submitted through Gutterman PC.

444.   Zaretskiy and Gutterman PC's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

445.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTIETH CAUSE OF ACTION
**Against Zaretskiy and Gutterman PC**
**(Unjust Enrichment)**

446.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above

447.   As set forth above, Zaretskiy and Gutterman PC has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

448.   When Liberty Mutual paid the bills and charges submitted by or on behalf of Gutterman PC for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

449.   Zaretskiy and Gutterman PC has been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Zaretskiy and Gutterman PC voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

450.   Zaretskiy and Gutterman PC's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

451.   By reason of the above, Zaretskiy and Gutterman PC has been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $65,000.00.

## AS AND FOR A THIRTY-FIRST CAUSE OF ACTION
### Against John Doe Defendants "1"- "10"
### (Aiding and Abetting Fraud)

452.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

453.   John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Zaretskiy and Gutterman PC.

454.   The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Gutterman PC in exchange for illegal kickbacks from Gutterman PC and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

455.   The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Gutterman PC to obtain payment from Liberty Mutual and other insurers.

456.   John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Gutterman PC for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

457.   The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $65,000.00 pursuant to the fraudulent bills submitted through Gutterman PC.

458.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

459.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A THIRTY-SECOND CAUSE OF ACTION
### Against Baldonado, Zaretskiy and Baldo Wellness
### (Common Law Fraud)

460.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

461.    Baldonado, Zaretskiy and Baldo Wellness intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Baldo Wellness.

462.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were

103

medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Baldonado, the representation that the billed for services were performed by Baldo Wellness's employees, when in fact the billed-for-services submitted by Baldo Wellness were performed by independent contractors.

463.   Baldonado, Zaretskiy and Baldo Wellness intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Baldo Wellness that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "9".

464.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $35,000.00 pursuant to the fraudulent bills submitted through Baldo Wellness.

465.   Baldonado, Zaretskiy and Baldo Wellness's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

466.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTY-THIRD CAUSE OF ACTION
**Against Baldonado, Zaretskiy and Baldo Wellness**
**(Unjust Enrichment)**

467.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

468.    As set forth above, Baldonado, Zaretskiy and Baldo Wellness have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

469.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Baldo Wellness for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

470.    Baldonado, Zaretskiy and Baldo Wellness have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Baldonado and Baldo Wellness voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

471.    Baldonado, Zaretskiy and Baldo Wellness's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

472.    By reason of the above, Baldonado, Zaretskiy and Baldo Wellness have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $35,000.00.

### AS AND FOR A THIRTY-FOURTH CAUSE OF ACTION
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

473.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

474.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Baldonado and Zaretskiy, using Baldo Wellness.

475.     The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Baldo Wellness in exchange for illegal kickbacks from Baldonado and Baldo Wellness and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

476.     The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Baldonado and Baldo Wellness to obtain payment from Liberty Mutual and other insurers.

477.     John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Baldonado and Baldo Wellness for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

478.     The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $35,000.00 pursuant to the fraudulent bills submitted through Baldo Wellness.

479.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

480.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTY-FIFTH CAUSE OF ACTION
**Against Sezan and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

481.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

482.    Ralph Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

483.    Sezan and Zaretskiy knowingly has conducted and/or participated, directly or indirectly, in the conduct of Ralph Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since its inception seeking payments that Ralph Medical was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Ralph Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent they were provided at all – by independent contractors, rather than by Ralph Medical employees. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "10".

484.    Ralph Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Sezan and Zaretskiy operate Ralph Medical, insofar as Ralph Medical is

not engaged in a legitimate medical practice, and therefore, acts of mail fraud are essential in order for Ralph Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted by Ralph Medical to the present day.

485.    Ralph Medical is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by Ralph Medical in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

486.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $28,000.00 pursuant to the fraudulent bills submitted through Ralph Medical.

487.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRTY-SIXTH CAUSE OF ACTION**
**Against Sezan and Zaretskiy**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

488.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

489.    Ralph Medical is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

490.    Sezan and Zaretskiy are employed by or associated with the Ralph Medical enterprise.

491.    Sezan and Zaretskiy knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Ralph Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Ralph Medical was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Ralph Medical obtained its patients through the Defendants' illegal kickback scheme; and (v) in many cases, the billed-for services were provided – to the extent that they were provided at all – by independent contractors, rather than by Ralph Medical's employees.  The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "10".

492.    Sezan and Zaretskiy knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

493.     Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $28,000.00 pursuant to the fraudulent bills submitted through Ralph Medical.

494.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A THIRTY-SEVENTH CAUSE OF ACTION**
**Against Sezan, Zaretskiy and Ralph Medical**
**(Common Law Fraud)**

495.     Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

496.     Sezan, Zaretskiy and Ralph Medical intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services submitted under the name of Ralph Medical.

497.     The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were

medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Sezan, the representation that the billed for services were performed by Ralph Medical's employees, when in fact the billed-for-services submitted by Ralph Medical were performed by independent contractors.

498.    Sezan, Zaretskiy and Ralph Medical intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Ralph Medical that were not compensable under the New York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "10".

499.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $28,000.00 pursuant to the fraudulent bills submitted through Ralph Medical.

500.    Sezan, Zaretskiy and Ralph Medical's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

501.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

### AS AND FOR A THIRTY-EIGHTH CAUSE OF ACTION
**Against Sezan, Zaretskiy and Ralph Medical**
**(Unjust Enrichment)**

502.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

503.    As set forth above, Sezan, Zaretskiy and Ralph Medical have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

504.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Ralph Medical for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

505.    Sezan, Zaretskiy and Ralph Medical have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Sezan, Zaretskiy and Ralph Medical voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

506.    Sezan, Zaretskiy and Ralph Medical's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

507.    By reason of the above, Sezan, Zaretskiy and Ralph Medical have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $28,000.00.

### AS AND FOR A THIRTY-NINTH CAUSE OF ACTION
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

508.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

509.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Sezan and Zaretskiy, using Ralph Medical.

510.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Ralph Medical in exchange for illegal

kickbacks from Sezan and Ralph Medical and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

511.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Sezan and Ralph Medical to obtain payment from Liberty Mutual and other insurers.

512.    John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Sezan and Ralph Medical for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

513.    The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $28,000.00 pursuant to the fraudulent bills submitted through Ralph Medical.

514.    This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

515.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FORTIETH CAUSE OF ACTION
**Against Sabodash and Zaretskiy**
**(Common Law Fraud)**

516.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

517.    Sabodash and Zaretskiy intentionally and knowingly made false and fraudulent statements of material fact to Liberty Mutual and concealed material facts from Liberty Mutual in the course of her submission of fraudulent bills seeking payment for the Fraudulent Services submitted through the Unincorporated Sabodash Provider.

518.    The false and fraudulent statements of material fact and acts of fraudulent concealment include (i) in every claim, the representation that the Fraudulent Services were medically necessary when, in fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds; (ii) in every claim, the representation that the Defendants were properly licensed and in compliance with all relevant laws and regulations governing healthcare practice when, in fact, the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst Defendants and others; (iii) in every claim, the representation that the billed-for services were medically necessary and properly billed in accordance with the Fee Schedule when, in fact, the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided; and (iv) in every claim, with the exception of services actually performed by Sabodash, the representation that the billed for services were performed by the Unincorporated Sabodash Provider employees, when in fact the billed-for-services submitted by the Unincorporated Sabodash Provider were performed by independent contractors.

519.    Sabodash and Zaretskiy intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through the Unincorporated Sabodash Provider that were not compensable under the New

York no-fault insurance laws. The fraudulent billings and corresponding mailings submitted to Liberty Mutual are described in the chart annexed hereto as Exhibit "11".

520.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $40,000.00 pursuant to the fraudulent bills submitted through the Unincorporated Sabodash Provider.

521.    Sabodash and Zaretskiy's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

522.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FORTY-FIRST CAUSE OF ACTION
### Against Sabodash and Zaretskiy
### (Unjust Enrichment)

523.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

524.    As set forth above, Sabodash and Zaretskiy have engaged in improper, unlawful, and/or unjust acts, using the Unincorporated Sabodash Provider, all to the harm and detriment of Liberty Mutual.

525.    When Liberty Mutual paid the bills and charges submitted by or on behalf of the Unincorporated Sabodash Provider for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

526.    Sabodash and Zaretskiy have been enriched at Liberty Mutual's expense by Liberty Mutual's payments, which constituted a benefit that Sabodash and Zaretskiy voluntarily accepted and distributed amongst herself notwithstanding the improper, unlawful, and unjust billing scheme.

527.    Sabodash and Zaretskiy's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

528.    By reason of the above, Sabodash and Zaretskiy has been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $40,000.00.

**AS AND FOR A FORTY-SECOND CAUSE OF ACTION**
**Against John Doe Defendants "1"- "10"**
**(Aiding and Abetting Fraud)**

529.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

530.    John Doe Defendants "1" - "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Sabodash and Zaretskiy, using the Unincorporated Sabodash Provider.

531.    The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to the Unincorporated Sabodash Provider in exchange for illegal kickbacks from Sabodash and the Unincorporated Sabodash Provider and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

532.    The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their

actions, there would have been no opportunity for Sabodash to obtain payment from Liberty Mutual and other insurers using the Unincorporated Sabodash Provider.

533.   John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to the Unincorporated Sabodash Provider for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

534.   The conduct of John Doe Defendants "1" – "10" caused Liberty Mutual to pay more than $40,000.00 pursuant to the fraudulent bills submitted through the Unincorporated Sabodash Provider.

535.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

536.   Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FORTY-THIRD CAUSE OF ACTION
### Against the Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10"
### (Violation of 18 U.S.C. § 1962(c))

537.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

538.   The Nominal Owners, Zaretskiy, John Doe Defendants "1" – "10" and the Provider Defendants, together constitute a separate association-in-fact "enterprise" (the "Zaretskiy Enterprise"), as defined in 18 U.S.C. § 1961(4), which engages in activities that affect interstate commerce.

539.    At all times relevant to this Complaint, the Nominal Owners and Zaretskiy were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c), with the Nominal Owners and Zaretskiy having an existence separate and apart from the Zaretskiy Enterprise.

540.    The members of the Zaretskiy Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically: (i) the Nominal Owners are the listed owners of the Provider Defendants, used their licenses to commit fraud and participated in the direction of the fraudulent billing and implemented a fraudulent predetermined treatment protocol with assistance from the Provider Defendants, Zaretskiy, John Doe Defendants "1" – "10", and others; (ii) the Nominal Owners, Zaretskiy and the Provider Defendants facilitated the submission of fraudulent bills to Liberty Mutual; (iii) the Provider Defendants, with the assistance of the Nominal Owners and Zaretskiy, used independent contractors to provide the Fraudulent Services, in violation of New York law; (iv) the Provider Defendants, with the assistance of the Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10", entered into illegal kickback and referral arrangements in order to expand the number of No-Fault Clinic locations at which they could carry out the fraudulent scheme, in violation of New York law; and (vi) Zaretskiy and the Nominal Owners caused the Provider Defendants to act in succession in order to evade insurer investigations and to perpetrate the fraudulent scheme undetected for periods of time in order to obtain reimbursement on knowingly fraudulent services. Accordingly, by associating together to form the Zaretskiy Enterprise, the Defendants were able to accomplish their unlawful goals to an extent that would not have been possible had they acted alone or without the aid of each other – namely, carrying

out a scheme to defraud of massive size and scope, maximizing their profits, evading detection by operating as successor entities, and operating and generating profits from a total of over 60 different No-Fault Clinic locations.

541.   The Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10" were employed by and/or associated with the Zaretskiy Enterprise. The Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10" knowingly conducted and/or participated, directly or indirectly, in the conduct of the Zaretskiy Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of bills and supporting documentation on a continuous basis for over two years seeking payments to which the Defendants were not entitled under the No-Fault Laws.   Specifically, the acts alleged herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341:

(i)     The Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10" devised, executed, and/or knowingly assisted in carrying out a scheme and artifice to defraud Liberty Mutual of their money and property by means of false and fraudulent pretenses, representations and promises and by the concealment of material facts regarding the healthcare claims for payment;

(ii)    Pursuant to the scheme, the Nominal Owners, with the assistance of Zaretskiy and John Doe Defendants "1" – "10", submitted, or caused to be submitted, to Liberty Mutual, through the Provider Defendants, false and fraudulent claims and information in which the Nominal Owners concealed that the charges submitted were for services provided pursuant to a fraudulent predetermined treatment protocol;

(iii)   Pursuant to the scheme, the Nominal Owners, with the assistance of Zaretskiy and John Doe Defendants "1" – "10",  submitted, or caused to be submitted, to Liberty Mutual, through the Provider Defendants, false and fraudulent claims and information in which the Nominal Owners falsely represented that the testing they administered was medically necessary for the care of Insureds;

(iv)    Pursuant to the scheme, the Nominal Owners, with the assistance of Zaretskiy and John Doe Defendants "1" – "10", submitted, or caused to be submitted, to Liberty Mutual, through the Provider Defendants, false and fraudulent claims and information in which the Nominal Owners falsely represented that the services that the Provider Defendants billed for had been administered by employees, when in fact the services were administered by independent contractors;

(v)     Pursuant to the scheme, the Nominal Owners submitted, or caused to be submitted, to Liberty Mutual, through the Provider Defendants, false and fraudulent claims and information in which the Defendants concealed the fact that the Provider Defendants, with the assistance of Zaretskiy and John Doe Defendants "1" – "10", had illegal kickback and referral arrangements in order to obtain Insureds; and

(vi)    For the purpose of executing this scheme and artifice to defraud, the Nominal Owners submitted, or caused to be submitted, such false and fraudulent claims and information to Liberty Mutual by use of the mail caused Liberty Mutual to make payments for said fraudulent claims.

542.    The Zaretskiy Enterprise's business is racketeering activity, inasmuch as it exists for the purpose of submitting fraudulent charges to insurers and seeking to collect on the submitted fraudulent charges. The predicate acts of mail fraud are the regular way in which the Defendants operate the Zaretskiy Enterprise and acts of mail fraud therefore are essential for the Zaretskiy Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud, continuous changing of TIN numbers and entities, implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Provider Defendants to the present day.

543.    A list of various mailings constituting a substantial number of the requisite predicate acts is annexed hereto as Exhibits "1" - "11." Each such mailing was made in furtherance of the mail fraud scheme.

544.    The Zaretskiy Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by employing and coordinating many professionals

and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to Liberty Mutual), by creating and maintaining patient files and other records, by negotiating and executing various facility lease agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of insurance payments, by facilitating payments stemming from the illegal kickback and referral arrangements, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

545.    The Zaretskiy Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing submitted to Liberty Mutual (and likely other automobile insurers). These inherently unlawful acts are taken by the Zaretskiy Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual (and likely other automobile insurers) through fraudulent no-fault billing.

546.    Liberty Mutual has been injured in their business and property by reason of the above-described conduct in that they have paid at least $549,000.00 pursuant to the fraudulent bills submitted in furtherance of the Zaretskiy Enterprise.

547.    By reason of their injuries, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FORTY-FOURTH CAUSE OF ACTION
**Against the Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10"**
**(Violation of 18 U.S.C. § 1962(d))**

548.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

549.     The Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Zaretskiy Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to Liberty Mutual.  These acts of mail fraud include, but are not limited to, those that are described in the charts annexed hereto as Exhibits "1" – "11.

550.     Each member of the Zaretskiy Enterprise knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $549,000.00 pursuant to the fraudulent bills submitted by Defendants through the Provider Defendants.

551.     By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**JURY DEMAND**

552.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a judgment be entered in their favor:

A.      On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual;

B.      On the Second Cause of Action against Menczelesz and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $95,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

C.      On the Third Cause of Action against Menczelesz and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $95,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

D.      On the Fourth Cause of Action against Menczelesz, Zaretskiy and GM Wellness, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $95,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Menczelesz, Zaretskiy and GM Wellness, more than $95,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $95,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Menczelesz, Zaretskiy and GM Medical, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $44,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Menczelesz, Zaretskiy and GM Medical, more than $44,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $44,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against Fray and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $93,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

K.      On the Eleventh Cause of Action against Fray and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $93,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

L.      On the Twelfth Cause of Action against Fray, Zaretskiy and Fray PC, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $93,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Fray, Zaretskiy and Fray PC, more than $93,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

N.      On the Fourteenth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $93,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against Galea, Zaretskiy and Galmar Diagnostic, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $3,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Galea, Zaretskiy and Galmar Diagnostic, more than $3,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

Q.      On the Seventeenth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $3,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Galea, Zaretskiy and MAG Medical, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $29,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Galea, Zaretskiy and MAG Medical, more than $29,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

T.      On the Twentieth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $29,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

U.      On the Twenty-First Cause of Action against Galea, Zaretskiy and MG Medical, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $18,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

V.      On the Twenty-Second Cause of Action against Galea, Zaretskiy and MG Medical, more than $18,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

W.      On the Twenty-Third Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $18,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

X.      On the Twenty-Fourth Cause of Action against Slukhinsky and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $94,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

Y.      On the Twenty-Fifth Cause of Action against Slukhinsky and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $94,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

Z.      On the Twenty-Sixth Cause of Action against Slukhinsky, Zaretskiy and Classic Medical, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $94,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

AA.     On the Twenty-Seventh Cause of Action against Slukhinsky, Zaretskiy and Classic Medical, more than $94,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

BB.     On the Twenty-Eighth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $94,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

CC.     On the Twenty-Ninth Cause of Action against Zaretskiy and Gutterman PC, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $65,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

DD.     On the Thirtieth Cause of Action against Zaretskiy and Gutterman PC, more than $65,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

EE.     On the Thirty-First Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $65,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

FF.     On the Thirty-Second Cause of Action against Baldonado, Zaretskiy and Baldo Wellness, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $35,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

GG.     On the Thirty-Third Cause of Action against Baldonado, Zaretskiy and Baldo Wellness, more than $35,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

HH.     On the Thirty-Fourth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $35,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

II.     On the Thirty-Fifth Cause of Action against Sezan and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $28,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

JJ.     On the Thirty-Sixth Cause of Action against Sezan and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $28,000.00, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1962(c) plus interest;

KK.     On the Thirty-Seventh Cause of Action against Sezan, Zaretskiy and Ralph Medical, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $28,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

LL.     On the Thirty-Eighth Cause of Action against Sezan, Zaretskiy and Ralph Medical, more than $28,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

MM.     On the Thirty-Ninth Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $28,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

NN.     On the Fortieth Cause of Action against Sabodash and Zaretskiy, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $40,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

OO.     On the Forty-First Cause of Action against Sabodash and Zaretskiy, more than $40,000.00 in compensatory damages, plus costs interest and such other and further relief as this Court deems just and proper;

PP.     On the Forty-Second Cause of Action against John Doe Defendants "1" - "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $40,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

QQ.    On the Forty-Third Cause of Action against the Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10", for compensatory damages in an amount to be determined at trial but in excess of $549,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and

RR.    On the Forty-Fourth Cause of Action against the Nominal Owners, Zaretskiy and John Doe Defendants "1" – "10", for compensatory damages in an amount to be determined at trial but in excess of $549,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest.

Dated: April 11, 2022
       Uniondale, New York

RIVKIN RADLER LLP

By:    _/s/ Barry I. Levy_____
       Barry I. Levy, Esq.
       Frank P. Tiscione, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company*